# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE SANOFI SECURITIES LITIGATION

Case No. 14 Civ. 9624-PKC

**CLASS ACTION**

**PLAINTIFFS' MEMORANDUM OF
LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY  10016
Phone: (212) 661-1100
Fax: (212) 661-8665

10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Phone: (312) 377-1181
Fax: (312) 377-1184

*Counsel for Plaintiffs and the Class*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

FACTS ALLEGED.............................................................................................. 3

ARGUMENT ....................................................................................................11

I.  Applicable Legal Standards Do Not Favor Dismissal....................................... 11

   A. The PSLRA does not require pleading of trial evidence or a "smoking gun" ..............11

   B. Statements of named whistleblowers must be credited ..................................13

II. The CAC Adequately Alleges Material Misrepresentations by Sanofi and Viehbacher ...15

III. The CAC Raises a Strong and Compelling Inference of Scienter ...................................20

   A. The inference of scienter from facts alleged in the CAC is cogent and compelling .....20

   B. Defendants raise no competing inference as to scienter  ................................................23

IV. The CAC Adequately Alleges Loss Causation ..............................................................26

V. The CAC Adequately Alleges a Control Person Claim Against Viehbacher ...................29

CONCLUSION ...................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34 (2d Cir. 2012).......... 24, 26

*Arista Records LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ................................... 12

*Arkansas Teacher Ret. Sys. v. Bankrate, Inc.,* 18 F. Supp. 3d 482 (S.D.N.Y. 2014) .............18

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ................................................... 12

*City of Brockton Ret. Sys. v. Avon Prods., Inc.,* No. 11-cv-4665, 2014 WL 4832321
(S.D.N.Y. Sept. 29, 2014) .......................................................................18

*Cohen v. Stevanovich*, 722 F. Supp. 2d 416 (S.D.N.Y. 2010) ...............................26

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)................................... 9

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ...................................12, 26, 27

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297
(2d Cir. 2015) .......................................................................20

*Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) .............12, 27, 29

*Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212 (S.D.N.Y. 2008) ....... 17

*Harrison v. Rubenstein*, No. 02–CV–9356, 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007) .....26

*HSN Nordbank AG v. RBS Holdings USA Inc.*, No. 13 CIV. 3303 PGG, 2015 WL
1307189 (S.D.N.Y. Mar. 23, 2015) ........................................................15

*In re Barrick Gold Sec. Litig.*, No. 13–cv–3851, 2015 WL 1514597
(S.D.N.Y. Apr. 1, 2015) ........................................................17

*In re Bear Stearns Mortgage Pass–Through Certificates Litig.,* 851 F. Supp. 2d 746
(S.D.N.Y.2012) ........................................................15

*In re BISYS*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ........................................7, 22

*In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir. 2002) ........................................17

*In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d 206 (S.D.N.Y.2010) ..................................... 26

*In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134 (D. Mass. 2001) ..............13

*In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352 (E.D.N.Y. 2013) ............................17

*In re Goldman Sachs Group, Inc. Sec. Litig.,* No. 10-cv-3461, 2014 WL 2815571
(S.D.N.Y. June 23, 2014) ...........................................................................18

*In re Initial Pub. Offering Secs. Litig.*, 544 F. Supp. 2d 277 (S.D.N.Y. 2008) ..................... 27

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..........................22

*In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008)................................. 3, 14

*In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011) .................15

*In re Lehman Bros. Sec. & Erisa Litig.*, No. 09-MD-2017 LAK, 2015 WL 5294759
(S.D.N.Y. Sept. 10, 2015)........................................................................... 26

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452
(S.D.N.Y. 2006) ......................................................................................22

*In re OSG Sec. Litig.*, 12 F. Supp. 3d 622 (S.D.N.Y. 2014) ....................................29

*In re Petrobras Sec. Litig.*, No. 14-CV-9662 JSR, 2015 WL 4557364
(S.D.N.Y. July 30, 2015) ........................................................................... 18

*In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521 (S.D.N.Y. 2009) ........................................17

*In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007) ........................14, 17

*In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458 (E.D. Pa. 2014) ................................23

*In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) ..................17

*Janbay v. Canadian Solar, Inc.*, No. 10 CIV. 4430 RWS, 2012 WL 1080306
(S.D.N.Y. Mar. 30, 2012) ........................................................................... 14

*King Cnty. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334 (S.D.N.Y. 2010) ........ 26

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) ..................................25, 26

*Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC, 2012 WL 3957916
(S.D.N.Y. 2012) ..............................................................................12, 13, 29

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 13-1476-CV, 2015 WL
4492258, at *16 (2d Cir. July 24, 2015) ................................................................. 15

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) .................................................... 24

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011) ............................................. 11

*Mauss v. Nuvasive, Inc., et al.*, No. 13-cv-2005 (S.D. Cal. Aug. 28, 2015) .......................... 17

*Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245 (2d Cir. 2014) ................................... 15

*Mills v. Polar Molecular Corp.,* 12 F.3d 1170 (2d Cir.1993).................................................. 12

*Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 961 (N.D. Cal. 2015) ........................................ 18

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ...................................................................... 20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015) .....................................................................................................................................18, 19

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, No. 13 CV. 5696 JGK, 2015 WL 981518 (S.D.N.Y. Mar. 6, 2015) ........................................................................... 14

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ........................................................................8

*Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598 (S.D.N.Y. 2012) .............................................3

*Strougo v. Barclays PLC*, No. 14-CV-5797 SAS, 2015 WL 1883201 (S.D.N.Y. Apr. 24, 2015) .......................................................................................................15

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008) .........................................................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308 (2007) ........................................ *passim*

*TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438 (1976) ....................................................... 18

*Bell Atlantic Co. v. Twombly*, 550 U.S. 554 (2007).............................................................3, 11

*Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457 (S.D.N.Y. 2013) .......................13, 26, 27

*Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375 (2d Cir. 1995)......................................... 3

**<u>Statutes and Regulations</u>**

42 U.S.C. § 1320a-7b(b) ........................................................................................4

31 U.S.C. §§ 3729–3733.........................................................................................4

21 C.F.R. § 314.107(b)(3)......................................................................................10

## INTRODUCTION

Sanofi is a global pharmaceutical company with a long history of corruption.  It has been linked to fraud on at least four continents, including multiple schemes to manipulate drug pricing in the United States.  ¶¶ 30-37.[1]  Plaintiffs' Consolidated Amended Complaint ("CAC") arises from Defendants' concealment of a widespread illegal marketing scheme involving Sanofi's most important drug, Lantus.  The scheme was corroborated by two whistleblowers who were fully identified in the CAC, and was virtually identical to conduct for which Sanofi was convicted in Germany in May 2013.  ¶¶ 37-50.

As Diane Ponte and Jean Kazimir confirmed, Sanofi funneled money through disguised contracts with consultancies such as Accenture and Deloitte to illegally influence drug purchasers like retail and hospital pharmacies to favor Lantus and other Sanofi diabetes drugs over those of its chief competitor, Novo Nordisk ("Novo").  ¶¶ 2-3, 9-10, 38-50.  This violated the Anti-Kickback Act, which prohibits any form of direct or indirect payment to influence certain drug purchases, and may have also violated the False Claims Act.  ¶ 28.   Defendants hid the illegal practices from investors during the Class Period, and made false affirmative statements regarding their compliance programs and supposed "zero tolerance" for corruption.  ¶¶ 54-76.

In their roles at Sanofi's U.S. headquarters, whistleblowers Kazimir and Ponte were both directly involved with, and knowledgeable of, the illicit contracts used to implement the scheme.  *See, e.g.,* ¶¶ 39, 43-44, 48-49.  Ms. Kazimir processed contracts for Sanofi as a procurement contracts coordinator, while Ms. Ponte reviewed contracts for legal and policy compliance as a

---

[1] Defendants are Sanofi and its former Chief Executive Officer ("CEO") Christopher A. Viehbacher.  Defendants' opening memorandum (Dkt. No. 30) is referred to herein as "Defs' Mem.").  Citations herein to "¶__" refer to the numbered paragraphs of the CAC (Dkt. No. 22).

paralegal in the Contracts division of Sanofi's legal department.  ¶¶ 39, 48.  Ms. Ponte was told that Viehbacher wanted her to approve nine such contracts totaling $34 million without the delay that completing her compliance review would take.  ¶ 45.    These contracts were part of a broader program, which Ms. Kazimir estimated to include "hundreds of millions of dollars" in illicit payments.  ¶ 48.  Both whistleblowers reported the wrongdoing internally to Sanofi.  ¶ 50.  Ms. Ponte demanded that Sanofi open an internal investigation, and understands that the investigation confirmed wrongdoing.  ¶ 46.

The scheme worked until Ponte and Kazimir blew the whistle.  U.S. revenues soared for Lantus, Sanofi's flagship diabetes drug (as well as its diabetes program generally), as the Company used the illicit influence to secure favorable one-year formulary and pricing agreements with retailers and hospitals.  *See, e.g.,* ¶¶ 10, 49, 61, 79-80.  Not surprisingly, this favorable pricing suddenly collapsed approximately one year after the internal investigation, *i.e.,* just when the favorable terms secured by the unlawful marketing practices would have been up for renegotiation.  ¶ 61.  Sanofi's Board of Directors, tired of the corruption Viehbacher had tolerated throughout his tenure as CEO, began to discuss his removal.  ¶¶ 11, 88.  When these risks, concealed by Defendants' Class Period misrepresentations and omissions, materialized between October 27 and 29, 2014, Sanofi's ADS shares plummeted $8.80, or more than 16%, on extremely heavy volume.

Unable to cite even a single case supporting dismissal of claims corroborated, as here, by two separate named whistleblowers, Defendants impermissibly ask the Court to delve into trial issues.  Defendants attack witness credibility, attempt to dispute (or altogether ignore) well-pleaded factual allegations that must be accepted as true, and attempt to draw unreliable and misleading inferences from extrinsic evidence that is not properly before the Court.  *See, e.g.,*

Defs' Mem. at 6, 9-14, 24 n.11.  Such arguments are wholly inappropriate on a motion to dismiss.  "[T]he [Private Securities Litigation Reform Act of 1995 ("PSLRA")] in no way turns [Rule] 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt, including credibility calls." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008).

For pleading purposes, the CAC does all the law requires.  It identifies in detail each misrepresentation and specifies exactly what is false and/or misleading.  ¶¶ 54-76.  The CAC also pleads facts leaving no doubt that Viehbacher and Sanofi knew (or recklessly disregarded) the corruption they hid from investors during the Class Period.  ¶¶ 41, 51-53.  Finally, the CAC plausibly alleges that the materialization of the risks concealed by Defendants' misrepresentations proximately caused investors' losses.  ¶¶ 78-88.

Whether Plaintiffs are ultimately able to prove these allegations through admissible evidence is an issue for trial, not Rule 12(b)(6).  "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atlantic Co. v. Twombly*, 550 U.S. 554, 563 n.8 (2007).  "The question in a Rule 12 motion to dismiss 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)).

<u>**FACTS ALLEGED**</u>

Sanofi is a global pharmaceutical company.  ¶ 26.  Sanofi's largest and most important drug is Lantus, a long-acting (basal) insulin injection for the treatment of diabetes.  *See, e.g.,* ¶

29.  For example, in 2013, Sanofi sold more than €5.7 billion of Lantus, more than twice as much as any other drug.  ¶ 38.  Throughout the Class Period,[2] Sanofi considered Lantus to be its "flagship product."  ¶ 55.

Lantus is therapeutically equivalent to another drug on the market, Novo's Levemir.  *Id.* Because they are therapeutically equivalent, regulations in most states allow pharmacists to fill a prescription for Lantus with Levemir, or vice versa.  *Id.*  Pharmacies will often make this switch, called therapeutic interchange, to fill prescriptions with whichever brand is listed on their preferred formulary.  *Id.*  Accordingly, it is extremely valuable for Sanofi to have Lantus preferred over Levemir on the formulary list of a retail pharmacy chain or hospital.  *Id.*

However, federal statutes prohibit Sanofi from using undue influence to gain preferred treatment for its drugs.  The Anti-Kickback Statute prohibits companies from using payments or rewards of any sort to influence prescription and purchase decisions for drugs and services subject to reimbursement by federally-funded healthcare programs like Medicare and Medicaid. ¶ 28; 42 U.S.C. § 1320a-7b(b).  If the influence results in a claim being submitted to a federally-backed healthcare program, it may also violate the False Claims Act.  ¶ 28; 31 U.S.C. §§ 3729–3733.

Sanofi has a long history of violating these statutes and engaging in other unlawful marketing practices.  Between 2007 and 2012, Sanofi paid hundreds of millions of dollars to settle claims that it violated the Anti-Kickback Statute and other laws in the marketing and pricing of some of its lesser drugs.  ¶¶ 31-33, 36.  According to reports of a Chinese whistleblower, Sanofi also attempted to bribe hundreds of Chinese doctors to favor its drugs.  ¶ 34.

---

[2] The Class Period runs from February 7, 2013 to October 29, 2014, both dates inclusive.

Viehbacher routinely allowed illicit marketing practices after he took control of Sanofi in late 2008, treating the resulting settlements as a cost of doing business. ¶ 35. In addition to settling the hundreds of millions of dollars of liability for prior schemes, under Viehbacher's watch, Sanofi manipulated the prices that Medicare and Medicaid paid for an arthritis drug, resulting in a $109 million fine. ¶ 36. In 2012, Sanofi was also convicted in Germany for making "illicit payments to a consultancy advising one of the drugmaker's clients…to win more orders from the client, a pharmaceuticals dealer." ¶ 37.

Two whistleblowers have independently confirmed that in 2012 and 2013, Sanofi implemented in the United States a scheme similar to the one for which it had been convicted in Germany. According to one of these whistleblowers, Ms. Kazimir, Sanofi engaged in contracts with Accenture to serve as "middlemen in a scheme that passed money in the form of incentive payments from Sanofi to Accenture and on to the pharmacies, such as Walgreens and Rite Aid." ¶¶ 48-49. Kazimir explained that the "goal was to increase sales of Sanofi's medications at the pharmacies by enticing the pharmacies to switch from favoring Sanofi's competitors' drugs to selling more of Sanofi's drugs." ¶ 49. According to Kazimir, the contracts served no legitimate purpose. ¶ 49.

Raymond Godleski, Assistant Vice-President of Special Projects, spearheaded these contracts for Sanofi. ¶¶ 41, 43-45. Godleski reported directly to Dennis Urbaniak, Vice-President in charge of Sanofi's U.S. Diabetes Unit. ¶ 41. Urbaniak, in turn, reported to Viehbacher. *Id.* According to Ms. Kazimir, Godleski asked her to process more than a hundred million dollars' worth of improper contracts with Accenture and Deloitte related to Sanofi's U.S. diabetes group. ¶ 48. Although the contracts were for illicit marketing *services*, Godleski insisted that Ms. Kazimir process the contracts as if they were purchase orders for *goods*, in

order to bypass Sanofi requirements for legal department approval of service contracts but not goods purchases.  ¶ 48.  This was important both because it minimized scrutiny and because, in violation of another Sanofi policy, Godleski had already executed the contracts without approval. ¶ 48.

In March 2013, there was a problem processing nine such contracts totaling $34 million. ¶¶ 43-44, 48.  Ariba, the supply chain management software that Sanofi used to process goods purchase orders, rejected the contracts, requiring them to be entered into NEXTS, a separate project management system that Sanofi used to process service contracts.  ¶ 48.  NEXTS routed the contracts to Ms. Ponte, who was tasked with reviewing service contracts for compliance purposes. ¶¶ 39, 44, 48.  Ms. Ponte flagged all nine contracts after determining that they involved "illegal incentives…to induce 'customers,' including physicians, hospitals, and/or retail pharmacy programs such as Walgreens and Rite Aid to, *inter alia*, unduly influence the prescribing of drugs, and/or improperly 'switch' from selling other manufacturers' drugs (ex: Novo drugs) to selling Sanofi drugs."  ¶ 43.   Significantly, the unlawful influence yielded favorable pricing and formulary terms with pharmacies that generally lasted for a full year.  ¶¶ 10, 38.

Ms. Ponte brought her concerns to Ms. Kazimir, who indicated that Godleski wanted the contracts approved without the usual legal screening.  ¶ 44.  On or about March 12, 2013, Godleski told Ponte that Viehbacher knew that Ponte had the nine contracts in her review queue, and was "extremely unhappy" that she had not yet approved them.  ¶ 45.  Ms. Ponte reported the conduct to her superiors and insisted that an internal investigation be opened.  *Id.*

As a result, an investigation was conducted beginning in March or April 2013 and continuing through at least the third quarter of 2013.  ¶ 46.  Both Ponte and Kazimir cooperated

with investigators.  ¶¶ 46, 50.   Furthermore, Ms. Ponte understands that the investigation confirmed that the nine contracts in question violated Sanofi's internal policies and federal law. ¶ 46.   During the investigation, both Godleski and Urbaniak left Sanofi under suspicious circumstances.  ¶ 47.

Sanofi and Viehbacher unquestionably knew about the internal investigation into the charges leveled by whistleblowers Ponte and Kazimir.  Sanofi knew because it conducted the internal investigation.[3]  ¶ 53.  Three specific Sanofi policies identified in the CAC ensured that Viehbacher was also informed about the conduct described by the whistleblowers:

- First, Sanofi's North American Corporate Compliance Officer updated the Board of Directors (including Board member Viehbacher) at least quarterly.  *Id.*

- Second, Viehbacher was part of Sanofi's North American Compliance Committee, which was charged with overseeing investigation of whistleblower reports.  *Id.*

- Third, Sanofi's U.S. Code of Conduct required that the Company inform persons accused of wrongdoing of any complaints lodged that implicate them.  *Id.*  Since Ms. Ponte had accused Viehbacher of pressuring approval of the illegal contracts, Sanofi was required to apprise Viehbacher of Ms. Ponte's charges "as soon as possible." *Id.*

Throughout the Class Period, Viehbacher and Sanofi repeatedly touted Sanofi's Lantus sales to investors, while concealing that those sales were boosted by illegal incentive payments funneled through the illicit marketing contracts under internal investigation.  ¶¶ 54-55, 61, 63, 67, 68, 73, 75.  Defendants also falsely told investors that Sanofi and its most senior executives,

---

[3] Additionally, knowledge of the wrongdoing is imputed to Sanofi because the wrongdoing was committed by senior Sanofi executives in the course of their employment.  *See, e.g., In re BISYS*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (inferring a corporation's scienter from the intentional misbehavior of its regional vice president and vice president of corporate finance).

including Viehbacher, had "zero tolerance for unethical conduct," "went beyond compliance," and had "an effective compliance organization" with "robust internal systems." *See, e.g.*, ¶¶ 57, 65-66, 71.  In truth, Sanofi operated in a pattern of corruption, and Defendants knew at the time of these statements that two whistleblowers had leveled corroborated charges of a grossly illegal scheme involving Sanofi's most important drug product and systematic bypass of compliance controls.  ¶¶ 38-53.

In the third quarter of 2014, when the formulary and pricing terms were up for renegotiation, but this time without the benefit of the "scheme that passed money in the form of incentive payments from Sanofi to Accenture and on to the pharmacies," Sanofi found itself unable to secure similarly favorable terms.  ¶¶ 48, 79-80.  Multiple analysts, who did not yet know of the illegal payments previously used to secure favorable terms, expressed surprise at Sanofi's sudden loss of pricing power.  ¶ 79.  One called the sudden shift "strange," while another asked "why did all this positive pricing you had in the first half suddenly evaporate?"  *Id.* Viehbacher blamed less favorable agreements entered into toward the end of the prior year (*i.e.*, right after the internal investigation was completed).  *Id.*  The less favorable agreements and deteriorated pricing were, in fact, the result of the end of the illicit marketing practices concealed by Defendants' Class Period misrepresentations.  ¶ 80.

Desperate to deflect attention from the actual market reaction expressed by analysts, Defendants try to piece together a conflicting inference from fragments of extrinsic evidence that are neither properly before the Court nor remotely applicable to the products at issue in this case. *See* Defs' Mem. at 6.   Defendants grossly violate the limits of judicial notice.  Judicial notice does not allow the Court to assume the truthfulness of a proposition offered by another company, even if recorded in a public filing. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (when

taking judicial notice of public records, the "court is to consider them on a Rule 12(b)(6) motion only to determine what the documents stated, and not to prove the truth of their contents.") (internal quotation omitted). [4]  Moreover, the conclusions Defendants draw from their contorted review of other companies' filings are so unreliable that, if proffered by an expert, they would be subject to exclusion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

For example, Defendants erroneously attempt to show that drugs competing with Lantus experienced similar pricing problems by referencing extrinsic comments that Novo made about rebates and generic competition for Prandin, one of Novo's diabetes drugs.  Defs' Mem. at 6. However, Prandin *is not* the Novo drug that competes with Lantus (identified correctly in the CAC as Levemir).  ¶ 29.   In fact, Prandin is not an insulin product at all, and cannot be interchanged with Lantus or Levemir.  *See* http://www.novo-pi.com/prandin.pdf; ¶ 29.[5]  Novo made no similar comments in its third quarter 2014 report about Levemir, and expressly stated in comments not acknowledged by Defendants that there was a "big difference" in the pricing

---

[4] Defendants' naked assertion that the post-corruption deterioration in Lantus pricing was already known, *see* Defs' Mem. at 24, is similarly misplaced.  None of the boilerplate language Defendants reference addresses Lantus specifically or even the general category of diabetes drugs (for which Lantus generated the overwhelming majority of revenue, *see, e.g.,* ¶ 61). Similarly, none of the cited boilerplate discloses that Sanofi diabetes drug prices had been artificially propped by illicit marketing practices, or that those practices were subject to an internal investigation.  Moreover, Defendants' counterfactual simply ignores the actual view of analysts, as quoted in the CAC, which found the change in forecast *specific to Lantus and other Sanofi diabetes drug pricing* to be "strange" and "sudden."  ¶ 79.

[5]  The reference to the term "generic" is a further indication that the statement Defendants quote has nothing whatsoever to do with Lantus, Levemir, or any other insulin product.  There is no such thing as "generic" insulin.  Instead, insulin products seeking to take advantage of a prior approval are regulated under a separate regime applying to "biosimilars," as Sanofi acknowledges in its SEC filings.  *See, e.g.,* Form 20-F filed by Sanofi on March 7, 2013 at 57 ("in the United States, a different regulatory exclusivity period applies to biological drugs….. an application for a biosimilar product that relies on a reference product may not be submitted to the FDA until four years after the date on which the reference product was first licensed, and that the FDA may not approve a biosimilar application until 12 years after the date on which the reference product was first licensed.").

environment between its various diabetes treatments.[6]   Accordingly, if Defendants press this unfounded argument at trial – where it belongs – it will be easily rebutted.

Defendants' reference to pricing comments made by another pharmaceutical company, Eli Lilly & Co., are similarly misleading.  *See* Defs' Mem. at 6.  Defendants know that Lilly did not compete with Lantus during the Class Period, because Sanofi filed multiple patent infringement lawsuits to stall approval of Lilly's competing drug, Abasria.[7]   Under FDA regulations, the filing of these lawsuits triggered a 30-month delay for Abasria approval, stalling its U.S. launch.  21 C.F.R. § 314.107(b)(3).[8]

During the third quarter of 2014, tired of the corruption that marked Viehbacher's tenure as CEO and with the illicit program to boost Lantus pricing no longer yielding results, Sanofi's Board began to discuss replacing Viehbacher.  ¶¶ 11, 78.  On October 27, 2014, news of these discussions leaked after a September 2014 letter from Viehbacher to the Board was published in French newspaper *Les Echos*.  ¶ 78.  Sanofi ADS shares dropped a statistically-significant amount, from $54.02 to $52.82, but the Company stemmed further losses by announcing that Viehbacher's succession was not on the agenda for the Board meeting scheduled later that day.  ¶ 78.

The following day, Defendants disclosed that they were no longer able to sustain favorable Lantus pricing, a materialization of the risks concealed by their Class Period

---

[6]   *See*  http://seekingalpha.com/article/2633415-novo-nordisk-a-ss-nvo-ceo-lars-sorensen-on-q3-2014-results-earnings-call-transcript.

[7]   *See, e.g.,*  http://www.fiercebiotech.com/story/sanofi-ups-legal-ante-block-lillys-lantus-biosimilar/2014-07-09  and  http://www.reuters.com/article/2014/07/08/us-elililly-sanofi-lawsuit-idUSKBN0FD20720140708.

[8] Nor did Merck, also impermissibly referenced in Defendants' memorandum, directly compete with Sanofi's flagship drug, Lantus, during the Class Period.  Defendants should not be permitted to take advantage of the lack of cross-examination at this stage to advance such false inferences.

misrepresentations.  ¶ 79.  On this news, Sanofi ADS's dropped an additional $4.75, or almost 9%, on extremely heavy volume.  ¶ 80.  Finally, on October 29, 2014, the Company announced it was firing Viehbacher. ¶ 81.  On that news, Sanofi ADS shares declined another $2.85, or almost 6%, on unusually heavy volume, to close at $45.22.  ¶ 82.

Ms. Ponte, who cooperated with the internal investigation into illicit marketing of Lantus, understands Mr. Viehbacher's termination to be connected to this wrongdoing.  ¶ 83.  Ms. Ponte made that allegation public in a lawsuit she filed against Sanofi, Viehbacher, Godleski and Urbaniak (among others) on December 3, 2014.  ¶ 83.  David Kliff, a veteran industry analyst, found the connection to be plausible.  ¶ 84.  In *Diabetic Investor*, Mr. Kliff wrote: "Although the company is not commenting on the lawsuit, the presence of the suit brings up several interesting questions.  The most obvious being, is this the real reason Viehbacher got canned?"  *Id.*[9]

## ARGUMENT

### I.   Applicable Legal Standards Do Not Favor Dismissal

#### A.   The PSLRA does not require pleading of trial evidence or a "smoking gun"

To withstand a motion to dismiss under Rule 12(b)(6), Plaintiffs "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322 n.12 (2011) (quoting *Twombly*, 550 U.S. at 570).  This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,*

---

[9] By contrast, as the CAC explains, the excuses that the Board gave for Viehbacher's termination were factually false and pretextual.  ¶¶ 85-88.  For example, Chairman Weinberg claimed that Viehbacher rebuffed for three years a Board request for a succession plan.  ¶ 86.  However, six months earlier, Sanofi's Board told the SEC that the Board had determined that Viehbacher fully satisfied all corporate governance goals, including "succession planning for all key posts."  ¶ 86.  Similarly, while the Board retroactively criticized Viehbacher's leadership and strategy, prior to the internal investigation, the Board consistently praised Viehbacher's performance, often noting his "leadership and strategic choices."  ¶ 87.

556 U.S. 662, 678 (2009).  A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  The relevant determination is not whether the plaintiff will ultimately prevail, but whether it is entitled to offer evidence in support of its claims.  *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC, 2012 WL 3957916, at *13-14 (S.D.N.Y. 2012).

If a complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, it should be sustained even if "actual proof of those facts is improbable." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010) (quoting *Twombly*, 550 U.S. at 556).  A court's determination of whether alleged facts are plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The standard does not require "the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120-21 (2d Cir. 2010).

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the sale or purchase of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Although the PSLRA and Federal Rule of Civil Procedure 9(b) require that the misrepresentations and omissions be identified with particularity, this burden is not onerous.  To satisfy the particularity requirement, a complaint need only "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lewy,* 2012 WL 3957916, at *7 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d

Cir.1993)).

The PSLRA also requires pleading of particularized facts giving rise to a strong inference of scienter. *See* 15 U.S.C. §78u-4(b)(2). The inference need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 324 (2007). Rather, an inference of scienter is strong if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* The CAC meets this standard.

### B. Statements of named whistleblowers must be credited

Defendants raise three legally and factually erroneous arguments attempting to attack the whistleblower allegations that are central to the CAC. First, Defendants claim that even though Diane Ponte and Jean Kazimir are identified by name, their statements should be discounted in the same manner that some courts apply to unnamed, confidential witnesses. *See* Defs' Mem. at 12. This makes no sense, and is not supported by any case cited by Defendants. Consistent with the general rule that all well-pleaded allegations must be accepted as true, a plaintiff who has expressly identified witnesses in a complaint "may rely upon their purported knowledge to support his allegations." *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 149 (D. Mass. 2001). To the extent Defendants want to question the credibility or knowledge of Ms. Ponte or Ms. Kazimir, they will have a full opportunity to do so at trial. However, a "motion to dismiss is not the proper vehicle to test the credibility of witnesses or the manner in which the plaintiffs will attempt to prove their allegations." *Lewy*, 2012 WL 3957916, at *13; *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 471 (S.D.N.Y. 2013) (same).

Defendants' attempt to question the credibility of whistleblowers named in the CAC is particularly misplaced because the CAC pleads facts demonstrating a high probability that each

13

knew the information she described.  *See, e.g., In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 392–93 (S.D.N.Y. 2007) (holding that describing such a probability is all that is required *even for unnamed witnesses*); *LDK Solar*, 584 F. Supp. 2d at 1243-44 (same).  Ms. Ponte and Ms. Kazimir were, respectively, a contracts paralegal responsible at Sanofi for reviewing contracts for policy and legal compliance, and a procurement contracts coordinator responsible for overseeing the processing of contracts.    ¶¶ 39, 44.  Both reviewed several of the illicit contracts directly at Sanofi's U.S. headquarters, and both were pressured by senior Sanofi executives to push through the contracts in violation of Sanofi policies and without full review. ¶¶ 44-45, 48.  Ms. Ponte demanded that an internal investigation be opened into the wrongdoing concealed by Defendants' Class Period misrepresentations, and both whistleblowers fully cooperated with investigators.  ¶¶ 3, 46, 50.

Defendants also erroneously contend that this Court may ignore the allegations of Ms. Ponte and Ms. Kazimir because neither alleges direct contact with Viehbacher.  *See* Defs' Mem. at 9-10.   However, direct contact is not a requirement even where the witness is confidential. *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, No. 13 CV. 5696 JGK, 2015 WL 981518, at *9-10 (S.D.N.Y. Mar. 6, 2015) ("[T]here is no baseline requirement of such contact," and argument to the contrary "is without merit.").[10]

Defendants' contention that this Court discredit allegations from Ms. Ponte simply because they were previously made in a lawsuit that she filed against Sanofi, Viehbacher and

---

[10] Defendants' reliance on *Janbay v. Canadian Solar, Inc.*, No. 10 CIV. 4430 RWS, 2012 WL 1080306, at *11 (S.D.N.Y. Mar. 30, 2012) is misplaced.   *Janbay* did not articulate a contact requirement, as *Orthofix* indicates would be "without merit," but instead merely stated that the complaint in that case failed to allege how the witness learned of the executive's statement or the context in which that statement was made.   Both pieces of information missing in *Janbay* are alleged here: Ms. Ponte was told of Defendant Viehbacher's statement by Raymond Godleski, and the statement occurred in the context of Ms. Ponte's refusal to process the illicit contracts outside of normal channels and without normal review.  ¶¶ 44-45.

others is equally specious. *See* Defs' Mem. at 9 n.3. There is no rule against such citation. *See, e.g., In re Bear Stearns Mortgage Pass–Through Certificates Litig.,* 851 F. Supp. 2d 746, 768 n. 24 (S.D.N.Y.2012); *HSN Nordbank AG v. RBS Holdings USA Inc.*, No. 13 CIV. 3303 PGG, 2015 WL 1307189, at *3-4 (S.D.N.Y. Mar. 23, 2015) (each allowing citation and noting that rule to the contrary would be illogical). Such citation is particularly appropriate here, because Ms. Ponte's contentions were corroborated by a second fact witness, Ms. Kazimir, and because Ms. Ponte separately verified the accuracy of her allegations to Plaintiffs' counsel herein, as the CAC makes clear. ¶ 40 n.1. *See Strougo v. Barclays PLC*, No. 14-CV-5797 SAS, 2015 WL 1883201, at *6 (S.D.N.Y. Apr. 24, 2015) (accepting allegations recited from external complaint and noting "counsel for plaintiffs have indicated that they have reached out to attorneys at the NYAG to verify the allegations in the Complaint."); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 13-1476-CV, 2015 WL 4492258, at *16 (2d Cir. July 24, 2015) (explaining that "[w]hile a complaint that *merely* recites others' allegations may … be insufficient," fraud claim was properly alleged when supported by overlapping factual allegations investigated by plaintiff's counsel) (emphasis in original).

## II.     The CAC Adequately Alleges Material Misrepresentations by Sanofi and Viehbacher

Federal securities laws impose an obligation on speakers to be both accurate and complete. *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 282 (S.D.N.Y. 2011). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). As the CAC details, in press releases, ethics reports, periodic filings and conference calls, Defendants affirmatively misrepresented Sanofi's legal compliance and ethics practices, and omitted material information by failing to inform investors that Sanofi was boosting U.S. sales of its flagship diabetes drug

through illicit marketing practices mirroring those for which it had been convicted in a German court.  ¶¶ 38, 54-55, 57, 61, 63, 67, 69, 71, 73, 75-76.

In particularized allegations, the CAC describes how Defendants: (a) falsely claimed to have superior ethics, effective compliance programs, and a "zero tolerance" approach to corruption, all while Sanofi was violating the Anti-Kickback Statute and using illicit payments funneled through consultancies to unlawfully influence drug purchasers and prescribers to favor Sanofi's diabetes drugs – and especially its flagship drug Lantus – over those of its competitors, ¶¶ 57-58, 65-66, 71-73; (b) repeatedly omitted material information regarding the corrupt marketing scheme that had been confirmed internally by multiple whistleblowers, ¶¶ 54-56, 61-64, 67-70, 73-76; (c) omitted from its reports of U.S. sales figures for Lantus and diabetes drugs that the sales were boosted by the illicit marketing practices, ¶¶ 54-56, 61-64, 67-70, 73-76; (d) omitted from its reports of general expenses that marketing expenditures included unlawful payments under the contracts described by the whistleblowers, ¶¶ 54, 61, 63, 67, 69, 73, 75; and (e) claimed that the Company's financial reports fairly depicted the Company's results, while in truth those results were boosted by and reliant upon the illicit marketing practices described by the whistleblowers, ¶¶ 59-60, 74.

For each alleged misrepresentation, the CAC specifies the fraudulent statement, identifies the speaker, describes when, where and how the statement was made, and explains why the statement was fraudulent by pleading facts sufficient to support a plausible belief as to the misleading nature of the statement or omission.[11]   That is all that Rule 9(b) and the PSLRA require.  *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003).

---

[11] With respect to Viehbacher's false and misleading SOX certifications, the CAC also identifies the particular internal control structures which were misrepresented, and the specific acts of fraud by Sanofi management which were not disclosed despite Viehbacher's certification to the

The law does not require precise quantification of the specific amounts by which each period's sales of Lantus were boosted by Defendants' illicit practices, or the amounts that Sanofi expended each quarter to fund the illicit marketing program, as Defendants erroneously assert. *See* Defs' Mem. at 19.   At the pleading stage, Plaintiffs are not required to quantify such information, which is uniquely within Defendants' possession.   *See, e.g., Mauss v. Nuvasive, Inc.*, *et al.*, No. 13-cv-2005  (S.D. Cal. Aug. 28, 2015) (slip opinion) at p. 15, attached hereto as Exhibit 1;   *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013). That a corporation has boosted its results by violating the Anti-Kickback Statute and/or False Claims Act is what matters.   *Mauss* at 15-16; *Gentiva*, 932 F. Supp. 2d at 368.   The "exact percentage of the revenue of the revenue and profits that was a misstatement because it was earned solely as a result of [the illegal practices]…is not of importance."   *Gentiva*, 932 F. Supp. 2d at 368. Likewise, a complaint need not identify the particular end purchasers influenced by unlawful marketing practices.   *Mauss* at 15-16.   *Accord In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002).   At any rate, the CAC *does* quantify the general size of the program (¶ 40) and the size, date, number of contracts, and processing of the specific illicit contracts reviewed by Ms. Ponte (¶¶ 41, 43).   Remaining quantitative details can be ascertained in discovery.

Defendants' "puffery" argument, which asserts that they need not have been truthful when discussing ethical and compliance practices with investors, is also misplaced.   *See* Defs'

---

contrary. Specifically, the CAC alleges that Sanofi's stated anti-corruption policies, including its "zero-tolerance policy" and its Financial Code of Ethics, were not enforced in practice and were bypassed by senior executives, *inter alia*, in the scheme confirmed by Ms. Ponte and Ms. Kazimir, and that as a result, Sanofi's financial reporting was impacted by the inflation of revenue as well as the inclusion of funds used for illegal activities in reported general expenses. *See* ¶¶ 38-53, 54-55, 57-58, 66. Accordingly, the CAC pleads actionable misrepresentations regarding these certifications. *See, e.g., In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 532-33 (S.D.N.Y. 2009); *Scottish Re*, 524 F. Supp. 2d at 391; *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 232 (S.D.N.Y. 2008).

Mem. at 20-21.  Whether a representation is mere puffery depends both on the generality of the statement and the context in which it is made.  *See Arkansas Teacher Ret. Sys. v. Bankrate, Inc.,* 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014).  Here, the Company repeatedly made concrete but false statements about ethics and compliance, in contexts intended to convince investors that Sanofi was not engaged in questionable conduct.  For example, Sanofi falsely touted to investors in a compliance report that is compliance programs were effective and its practices *exceeded* regulatory standards, and falsely stated in response to corruption charges that it had "zero tolerance" for corruption.  *See, e.g.,* ¶¶ 64-65, 71.  Under such circumstances, "a reasonable investor could rely on [the statements] as reflective of the true state of affairs at the Company." *In re Petrobras Sec. Litig.*, No. 14-CV-9662 JSR, 2015 WL 4557364, at *9-10 (S.D.N.Y. July 30, 2015); *see also In re Barrick Gold Sec. Litig.*, No. 13–cv–3851, 2015 WL 1514597, at *13–14 (S.D.N.Y. Apr. 1, 2015).[12]

Nor do the misrepresentations and omissions alleged in the CAC, aside from parts of the SOX certifications discussed above, involve statements of opinion.  Allegations describing "a thing done or existing or an actual happening" are factual in nature.  *Omnicare, Inc. v. Laborers*

---

[12]  These are not outlier decisions.  Concrete statements like those alleged here are regularly held actionable.  *See City of Brockton Ret. Sys. v. Avon Prods., Inc.,* No. 11-cv-4665, 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014) ("A reasonable investor could interpret Avon's statements about its allegedly elaborate internal controls operation as reflecting concrete steps that Avon had taken in this area, and might rely upon these statements as a guarantee that such steps had, in fact, been implemented."); *In re Goldman Sachs Group, Inc. Sec. Litig.,* No. 10-cv-3461, 2014 WL 2815571, at *4-5 (S.D.N.Y. June 23, 2014) ("Goldman's representations about its purported controls for avoiding conflicts were directly at odds with its alleged conduct.").  *See also TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976) (noting that the issue of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact").  In contrast, courts generally label statements regarding ethics to be puffery only where they are "inherently aspirational," unlike the concrete statements alleged here.  *Cf. Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 961 (N.D. Cal. 2015).

*Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015). (citation and quotation omitted).   Opinions, by contrast, are generally softened with words indicating that they are "belief[s]."   *Id.* at 1326.   Here, Defendants purported to describe and omitted "thing[s] done or existing," without couching their statements as beliefs or opinions.   *See* ¶¶ 54-76.

For example, Defendants' compliance statements describe – albeit falsely – what they claimed to be Sanofi's actual compliance practices and achievements.   *See, e.g.,* ¶ 66 (falsely stating that Sanofi had "zero tolerance for any unethical conduct"); ¶ 71 (falsely stating that they "maintain an effective compliance program").   They do not purport to describe mere aspirations. *Id.*   Similarly, the financial performance allegations involve actual financial results "done or existing," that failed to disclose illegal conduct "done or existing" necessary to render the statements not misleading in the context in which they were made.   *See, e.g.,* ¶¶ 54, 57, 61, 63, 67, 69.   Thus, Defendants find no cover in *Omnicare*.

Moreover, even if Defendants had expressed their statements as opinion rather than fact (for example, if they had said "we believe our compliance program is effective"), the CAC would still satisfy *Omnicare*.   Under *Omnicare*, a plaintiff may plead the falsity of an opinion by pleading facts demonstrating that a defendant's statements did not align with his or her subjective opinion, <u>or</u> by alleging specific, material facts going to the basis for the issuer's opinion whose omission makes the opinion statement misleading to a reasonable person.   135 S. Ct. at 1326-27, 1332.   Here, the CAC alleges: (a) facts that a reasonable jury could consider to be circumstantial evidence that Defendants did not subjectively believe Sanofi to have an effective compliance program; and (b) that Defendants omitted from their statements specific, objective facts about the illicit marketing scheme rendering their statements misleading.   *See, e.g.,* ¶¶ 38-50.

**III.     The CAC Raises a Strong and Compelling Inference of Scienter**

The CAC alleges that the wrongdoing concealed by Defendants' Class Period misrepresentations was reported internally, corroborated by two separate whistleblowers, and conveyed to Viehbacher via three separate mechanisms.  *See, e.g.,* ¶¶ 16, 45, 50, 53.  For purposes of scienter, these facts must be taken as true.  *Tellabs*, 551 U.S. at 322.   Because a reasonable person would deem the inference of scienter from these facts "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," the CAC must be sustained.  *Tellabs* at 324.   While robust, the *Tellabs* standard "does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *Tellabs* at 324 n. 5).

**A.  The inference of scienter from facts alleged in the CAC is cogent and compelling**

Complaint allegations support a strong inference that Defendants Sanofi and Viehbacher knew about (or recklessly disregarded) the corrupt scheme described by the two named whistleblowers which they omitted from investors and which contradicted their public statements.  ¶¶ 46, 50, 51-53.  As the CAC alleges, Viehbacher was informed of and had access to the whistleblower allegations under three of Sanofi's policies.  ¶ 53. Accordingly, he (and Sanofi) both "knew facts or had access to information suggesting that their public statements were not accurate," or at the very least "failed to check information they had a duty to monitor." *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

Ponte and Kazimir each fully reported the illicit marketing scheme to Sanofi's internal investigators, and Ponte understands that investigators verified her charges.  ¶¶ 46, 50. Accordingly, Sanofi knew of the wrongdoing that was concealed from investors.     So did

20

Viehbacher, who was a member of the Compliance Committee charged with overseeing investigation of whistleblower reports.  ¶ 53.  He had a duty to monitor the investigation and unquestionably was informed of the illicit practices described by Ponte and Kazimir, especially as the misconduct involved Sanofi's most important drug and senior Sanofi executives.  ¶¶ 41-45, 47-48, 51.

Additionally, Sanofi policies required Viehbacher and other directors to be informed at least quarterly about compliance issues in North America by Sanofi's North American Corporate Compliance Officer.  ¶ 53.  Defendants do not question that the corruption described by whistleblowers Ponte and Kazimir was of the magnitude that would be included in such reports, nor could they given the serious nature of the whistleblowers' accusations.

Sanofi's internal code of conduct also required it to report these allegations to Viehbacher, because he was named in the wrongdoing by Ponte.  *Id.*  As alleged in the CAC, Ms. Ponte was told by Godleski that Viehbacher himself wanted her to push through the nine illicit, pre-executed contracts without the delay of a full review.  ¶ 51.

In light of CAC allegations detailing the three above-listed mechanisms by which Viehbacher was informed of the whistleblower information, Defendants' claim that the allegation of his knowledge is "conclusory" or "naked" makes no sense whatsoever. Defendants' claim that the investigation might not have found actual wrongdoing, *see* Defs' Mem. at 16-17, is equally illogical given Ms. Ponte's statement that the investigation confirmed her charges.  ¶ 46.  Defendants do not cite a single case rejecting scienter under those circumstances.  To require, as Defendants erroneously suggest, that the CAC directly cite Sanofi or Sanofi investigators conceding the fraud is tantamount to requiring a "smoking gun," a standard expressly rejected by the Supreme Court in *Tellabs*. 551 U.S. at 324.

21

Sanofi's corporate sciente r is further established by CAC allegations of conscious misbehavior and knowledge of two Sanofi Assistant Vice-Presidents, Godleski and Urbaniak.  ¶¶ 41-48, 51.    Allegations that management-level employees were involved in, or aware of, the concealed misconduct "are more than adequate to raise an inference of conscious misbehavior or recklessness" on behalf of the corporation.[13]   *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 482 (S.D.N.Y. 2006); *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.").   Defendants do not argue otherwise.   *See* Defs' Mem. at 17 (citing *Dynex*).

Finally, the CAC's motive allegations provide context to Defendants' conscious misbehavior and/or recklessness.   *See, e.g.,* ¶ 10 (the diabetes franchise in which the illegal marketing took place was a cornerstone of Defendant Viehbacher's growth strategy); ¶ 25 (more than half of Defendant Viehbacher's compensation was tied to meeting growth goals, which hinged on Lantus sales).   They are provided for purposes of the holistic inquiry of "all of the facts alleged, taken collectively," as *Tellabs* requires.   *See Tellabs* at 323.   Defendants' attempt to criticize these allegations in isolation is improper.   *Id.*   The CAC does not purport to allege –

---

[13]   *See also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (no requirement "that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter"); *BISYS*, 397 F. Supp. 2d at 443 (finding corporate scienter, in part, from imputed acts of vice president not named as defendant); *In re Marsh*, 501 F. Supp. 2d at 481 ("Imposing [such a] limitation at the pleading stage would doom the long-recognized concept of primary entity liability to irrelevancy, effectively limiting the liability of corporate defendants to secondary liability under Section 20(a).").

and Plaintiffs do not pursue – motive and opportunity as an independent means of establishing scienter.[14]

### B.  Defendants raise no competing inference as to scienter

*Tellabs* only permits courts to weigh competing inferences on a motion to dismiss in one limited circumstance: where a defendant, accepting complaint allegations as true, has proffered a nonculpable explanation for the supposed wrongdoing.  *See Tellabs*, 551 U.S. at 314.  For example, in *Tellabs*, the issue was whether allegations of channel stuffing, accepted as true, described "the illegitimate kind (e.g., writing orders for products customers had not requested) or the legitimate kind (*e.g.,* offering customers discounts as an incentive to buy)."  *Id.* at 325.  Here, Defendants offer no innocent explanation for why Sanofi contracted with consultancies to influence the purchasing decisions of end users (a practice for which it had been convicted in Germany), why hundreds of millions of dollars' worth of diabetes marketing consulting contracts were misclassified, why Ms. Ponte was pressured to approve contracts that were executed in

---

[14] Defendants' stock purchase argument is based upon grossly misrepresented facts and does not support an inference that Defendants intended to be truthful with investors.  *See* Defs' Mem. at 15.  Defendants cite to Exhibit 16 of Venezia Decl., apparently a screenshot from a Bloomberg terminal, for their assertion that "In the fourth quarter of 2013, Mr. Viehbacher increased his holdings of Sanofi shares by 40,000 shares (from 95,442 shares to 135,442 shares), certain of which were purchased at his own expense."  *Id.*  This is far beyond the scope of judicial notice, and highly misleading.  In a page from Sanofi's 20-F that Defendants chose to exclude from the excerpts proffered as Exhibit 1 to Venezia Decl., Sanofi explained that Defendant Viehbacher only purchased 10,000 shares in all of 2013 and did so at far-below-market prices through an Employee Savings Plan.  *See* Sanofi Form 20-F filed on March 7, 2014 at page 184, available at: http://www.sec.gov/Archives/edgar/data/1121404/000104746914001951/a2217900z20-f.htm.
The remaining 30,000 shares cited by Bloomberg appear to be "performance shares" that Viehbacher was granted by the Company in 2011, and that vested in 2013.  *See id.* at 164-65 (also noting that Viehbacher did not exercise any options in 2013 and listing no open market purchases in 2013).  That Viehbacher accepted free shares and bought a relatively small additional amount at far-below-market prices shows nothing.  Sanofi's corporate buyback is equally irrelevant.  *See, e.g., In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 (E.D. Pa. 2014) (corporate buybacks occur for a multitude of reasons and "weigh[] neither in favor of nor against an inference of scienter").

violation of Sanofi policies and that she understood to be illegal, or why Defendants repeatedly touted effective compliance and "zero tolerance" for corruption, when, in fact, multiple internal whistleblowers had informed them that corruption was rampant in Sanofi's most important division.

Instead, Defendants mistake the "competing inference" language in *Tellabs* as an invitation to argue their alternative theory of ***loss causation***, which Defendants merge into the scienter section of their brief.  *See* Defs' Mem. at 12-14 (asserting, albeit incorrectly, that there "are more compelling explanations" for the deterioration of diabetes drug pricing than the lapsing of favorable contracts procured by the illicit marketing practices described in the Complaint).  However, courts "are not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as [they] must in assessing allegations of scienter under the PSLRA."  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 266-67 (5th Cir. 2009).  *Accord Acticon AG v. China N. E. Petroleum Holdings Ltd*., 692 F.3d 34, 39 (2d Cir. 2012) (agreeing that determining reason for price movements necessarily involves "a competing theory of causation and raises factual questions not suitable for resolution on a motion to dismiss").

In addition to impermissibly contradicting well-pleaded complaint allegations, Defendants' "competing" loss causation inferences are factually ungrounded and misleading. Rather than address the pricing environment for Lantus, the drug promoted through the unlawful practices concealed from investors, Defendants cite to sweeping generalizations about the pharmaceutical industry that do not even mention Lantus.  *See* Defs' Mem. at 12-13.  For example, Defendants claim that Sanofi, with respect to its broad product line, "consistently" described "increased pricing and reimbursement pressure" and loss of market share to generics

throughout the Class Period.  *Id.* at 12.  However, as Defendants well know, Lantus had no generic competition, and Sanofi described no pricing or reimbursement pressures regarding Lantus and other diabetes drugs until surprising analysts at the end of the Class Period.  *See, e.g.,* ¶ 55 ("Diabetes continues to perform very well…Lantus is a flagship product"); ¶ 61 (diabetes franchise, anchored by Lantus, showed "very strong, a very, very continued growth"); ¶ 63 (U.S Lantus growth above 20%"; ¶ 67 (Lantus sales grew more than 20%); ¶ 69 (Lantus sales grew 20%); ¶ 75 (quarterly performance driven by Lantus growth); ¶ 79 (referring to "positive pricing in the first half [of 2014]").

Defendants' unfounded claim that the loss in pricing power was expected due to pressures described by companies Defendants incorrectly label "direct competitors" is equally misplaced.  *See* Defs' Mem. at 6, 13.  None of the analysts cited in the CAC linked Sanofi's fall 2014 price deterioration to broad industry pressures, as Defendants now ask this Court to assume without evidence.  Analyst Tim Minton found the sudden pricing deterioration "strange."  ¶ 79.  Similarly, analyst Alexandra Schuele questioned why the prior pricing strength "suddenly evaporate[d]."  *Id.*  Moreover, none of the quotes Defendants cite out of context from other drug companies even remotely claimed pricing pressure in long-acting basal insulin, a market then consisting only of Sanofi's Lantus and Novo's Levemir.  *See* above at 8-9.

Defendants also advance impermissible competing loss causation inferences with respect to Viehbacher's termination.  *See* Defs' Mem. at 13-14.  The CAC alleges a plausible and detailed connection between the investigation into whistleblower charges naming Viehbacher, the cessation of favorable one-year pricing terms procured by the illicit marketing practices following that investigation, and Viehbacher's termination (and thus the resulting decline in ADR prices).  ¶¶ 10-15, 77-82; *see also* Section IV below.  The CAC also explains in detail why

the flimsy public reasons the Company used to explain Viehbacher's sudden termination were false and pretextual.  ¶¶ 83, 85-87.  Defendants are free to raise a competing inference at trial, to the extent they can come up with any supporting evidence.  However, for pleading purposes, the facts alleged in the CAC suffice.

## IV.    The CAC Adequately Alleges Loss Causation

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).  To sufficiently plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura*, 544 U.S. at 346-47.  This standard is "not meant to impose a great burden on a plaintiff," and a securities fraud complaint is sufficient so long as it sets forth what the alleged loss and causal connection to the fraud "might be."  *Id.*  Moreover, as Judge Kaplan recently explained, "plaintiffs are not required to allege that the particular misstatements and omissions directly caused the alleged losses."  *In re Lehman Bros. Sec. & Erisa Litig.*, No. 09-MD-2017 LAK, 2015 WL 5294759, at *2 (S.D.N.Y. Sept. 10, 2015) (internal quotations omitted).  Instead, they need only plead that "the alleged misstatements and omissions concealed the extent of [the company's exposure to a risk], the precarious nature of which, a jury could find, was foreseeable."  *Id.*

The CAC adequately alleges loss causation under either Rule 8 or 9(b).[15]  Plaintiffs have

---

[15] In *Dura*, the Supreme Court assumed but did not conclusively determine that the "short and plain statement" standard of Rule 8 applied to loss causation.  544 U.S. at 336.  While the Second Circuit has similarly declined to determine whether loss causation in securities fraud cases is governed by Rule 8 or 9(b), *see Acticon*, 692 F.3d at 38, most courts in this jurisdiction have held that a "short and plain statement" suffices.  *See, e.g., Van Dongen*, 951 F. Supp. 2d at 469; *In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d 206, 234 (S.D.N.Y.2010); *King Cnty. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010) (collecting cases).  *But see Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 432 (S.D.N.Y. 2010) and *Harrison v. Rubenstein*, No. 02–CV–9356, 2007 WL 582955, at *14 (S.D.N.Y. Feb. 26, 2007) (applying Rule 9(b)).

both provided Defendants an "indication of the loss and the causal connection that [they] ha[ve] in mind," *Dura*, 544 U.S. at 346-47, and alleged "facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *In re Initial Pub. Offering Secs. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) (quoting *Lentell*, 396 F.3d at 175).

Defendants acknowledge understanding that "Plaintiffs are proceeding under a 'materialization of the risk' theory," Defs' Mem. at 23, and thus are aware of the "connection that [they] ha[ve] in mind," *see Dura* at 346-47. Specifically, the CAC alleges that Sanofi ADR shares plummeted between October 27-29, 2014 on disclosures regarding the deterioration of Lantus pricing and Viehbacher's termination, and alleges numerous facts linking each of these events to the illicit marketing of Lantus concealed by Defendants' Class Period misrepresentations and omissions. ¶¶ 78-88. Accordingly, the Complaint sufficiently pleads that these events were within the "zone of risk" created by Defendants' Class Period misrepresentations and omissions. *See Van Dongen*, 951 F. Supp. 2d at 477; *see also Freudenberg*, 712 F. Supp. 2d at 202 ("A risk allegedly concealed by defendants which materialized and arguably caused the decline in shareholder value suffices").

Loss of pricing power for Lantus: The CAC alleges that Defendants used misrepresentations and omissions to conceal illegal marketing of Lantus through at least mid-2013, which resulted in favorable one-year formulary and pricing agreements that boosted Lantus pricing and inflated its sales through mid-2014. ¶¶ 38-50. In particular, the CAC specifies:

27

- that the scheme worked by funneling money through consultancies, as Sanofi had been convicted of doing in a smaller scale in Germany, ¶¶ 2, 37-50;

- that the scheme artificially boosted Lantus sales and pricing during the Class Period, because the financial influence funneled through the consultancies was used to secure favorable pricing and formulary agreements for Lantus and other Sanofi diabetes drugs with retail pharmacy chains and hospitals, *see, e.g.,* ¶¶ 29, 49;

- that the scheme was able to maintain favorable pricing and inflate Lantus results for approximately a year after the illegal marketing ended because the resulting pricing agreements typically lasted for a full year, ¶¶ 10, 79-80; and

- that the lapsing of the favorable terms secured by the concealed scheme was a proximate cause of the deterioration in Lantus pricing announced on October 28, 2014, ¶¶ 13, 80. *See also* ¶ 79 (quoting Defendant Viehbacher's admission that the adverse pricing materialized in Fall 2014 because less favorable contracts were secured "toward the end of the [prior] year.").

Viehbacher's termination:  The CAC also alleges a proximate link between the Board's termination of Viehbacher and the corruption concealed by Defendants' Class Period misrepresentations.  Viehbacher was expressly named by one of the whistleblowers, Ms. Ponte, as a source of pressure to push through illegal marketing contracts.  ¶ 45.  Ms. Ponte's allegations triggered an internal investigation, about which the Board of Directors was briefed at least quarterly.  ¶ 53.  The internal investigation, which confirmed the wrongdoing, lasted at least through the third quarter of 2013.  ¶¶ 8-9, 46.  The Board, tired of Viehbacher's corruption, began to discuss dumping him as soon as the corrupt practices stopped bearing fruit.  ¶¶ 11-12,

78.  Viehbacher's two subordinates running the illicit marketing scheme, Godleski and Urbaniak, also left the Company under unusual circumstances.  ¶ 47.

Ms. Ponte, who participated in the investigation, understood that Viehbacher's termination was tied at least in part to the investigation.  ¶ 83.   David Kliff, a recognized industry analyst, similarly found the connection to be plausible.  ¶ 84; *see also* above at 10. That Sanofi does not concede the corruption as a reason for his termination is irrelevant.  A corporation cannot defeat loss causation, and therefore immunize itself from liability, by refusing to admit to the fraud.  Indeed, the materialization of the risk doctrine exists because "corporate wrongdoers rarely admit that they committed fraud."  *Freudenberg*, 712 F. Supp. 2d at 202.[16]

## V.    The CAC Adequately Alleges a Control Person Claim Against Viehbacher

Defendants do not contest that the CAC adequately alleges that Viehbacher was a control person with respect to the Class Period statements of Sanofi, the corporation he ran.  Moreover, although the Second Circuit has not required that culpable participation be alleged, *see Lewy*, 2012 WL 3957916, at *11,[17] the CAC would satisfy such a requirement by allegations that Viehbacher: (a) took part in the underlying misconduct, ¶ 51; (b) disregarded the reports of the

---

[16] Regardless, as facts alleged in the Complaint demonstrate, the alternative reasons that Sanofi has publicly provided for Viehbacher's termination are demonstrably false and pretextual.  *See, e.g.*, ¶ 85 (investor and analyst sentiment couldn't explain Viehbacher termination); ¶ 86 (Sanofi's claim that Viehbacher wouldn't name successor was refuted by Sanofi's own SEC filings); ¶¶ 87-88 (Sanofi awarded Viehbacher maximum or near-maximum incentive compensation every year until after the internal investigation was initiated and the Board learned of the whistleblower allegations); ¶ 87 (Sanofi lauded rather than criticized Defendant Viehbacher's "leadership and strategic choices" until after the internal investigation).  If Defendants have any competent evidence supporting their claimed reasons for Defendant Viehbacher's dismissal, they may present it at trial.  Their desire to contradict well-pleaded allegations does not present a basis for dismissal.  *See, e.g., In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632 (S.D.N.Y. 2014) (sustaining complaint and crediting for purposes of scienter allegations supporting inference that proffered reason for executive terminations was pretextual).

[17] *But see, e.g., In re ShengdaTech, Inc. Sec. Litig.*, No. 11 CIV. 1918 LGS, 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (many district courts in this circuit required that "some" culpable participation be alleged).

whistleblowers that Sanofi concealed to investors, ¶ 53; and (c) signed some of the misleading documents, ¶ 57, 59, 73-74.  Thus, Viehbacher is liable under Section 20(a) of the Exchange Act for Defendant Sanofi's Section 10(b) violations.  15 U.S.C. § 78t(a).

## CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.  If, however, the Court finds any deficiency in Plaintiffs' claims, Plaintiffs respectfully respect leave to amend, particularly as no prior complaint has been dismissed.

Dated: October 9, 2015

Respectfully submitted,

**POMERANTZ LLP**

/s/ Joshua B. Silverman_____
Patrick V. Dahlstrom
Joshua B. Silverman
10 South LaSalle, Suite 3505
Chicago, Illinois  60005
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com
      jbsilverman@pomlaw.com


Marc I. Gross
Jeremy A. Lieberman
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email: migross@pomlaw.com
      jalieberman@pomlaw.com


*Attorneys for Plaintiffs and the Class*