UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
IN RE SANOFI SECURITIES LITIGATION

           14-cv-9624 (PKC)

           MEMORANDUM
              <u>AND ORDER</u>

-----------------------------------------------------------x

CASTEL, U.S.D.J.

       Plaintiffs Meitav DS Provident Funds and Pension Ltd. ("Meitav") and Joel

Mofsenson bring this putative class action on behalf of all persons who purchased Sanofi

American Depositary Shares ("ADS") between February 7, 2013 and October 29, 2014 (the

"Class Period").  They allege that defendants Sanofi and its former Chief Executive Officer

Christopher Viehbacher violated section 10(b), Rule 10b-5, and section 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act") when they misstated and omitted material

information regarding sales of Sanofi's diabetes product line and matters of corporate integrity.

       In essence, plaintiffs allege that Sanofi engaged in an illegal marketing scheme to

artificially boost the sales of its diabetes product line and hid those illegal practices from

investors while touting the product line's incredible sales growth and publicizing Sanofi's

commitment to corporate integrity.  Plaintiffs also allege that Viehbacher knew, or recklessly

disregarded information, about the illegal marketing scheme and made false or misleading

statements to the public.  According to plaintiffs, the eventual abandonment of Sanofi's illegal

marketing scheme caused a slowing of diabetes sales, which in turn led to a significant decline in

Sanofi's share price.

       Defendants move to dismiss the plaintiffs' Consolidated Amended Complaint (the

"CAC") pursuant to Rules 9(b) and 12(b)(6), Fed. R. Civ. P., and the Private Securities

Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (2012) (the "PSLRA").  Specifically, they argue that the CAC does not allege actionable misstatements and omissions, does not plead scienter with sufficient particularity to satisfy the pleading threshold of the PSLRA and Rule 9(b), and does not allege "loss causation."  Defendants also argue that the plaintiffs' section 20(a) claim fails because the CAC does not allege a primary violation of section 10(b), or, alternatively, does not allege defendant Viehbacher's "culpable participation" in any section 10(b) violation.

> For the foregoing reasons, defendants' motion to dismiss is granted.

BACKGROUND

> For the purposes of defendants' motion, all non-conclusory factual allegations are accepted as true, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and all reasonable inferences are drawn in favor of the plaintiff as the non-movant, see In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

I.      The Parties.

> Lead plaintiff Meitav is a subsidiary of Meitav Dash, an investment house based in Israel providing pension and mutual fund benefits with approximately $37 billion under management.  (CAC ¶ 22).  Meitav itself is a pension fund managing around $8 billion in retiree benefits.  (CAC ¶ 22).  Meitav and Joel Mofsenson, the other named plaintiff, acquired Sanofi ADS during the Class Period—February 7, 2013 to October 29, 2014.  (CAC ¶¶ 22-23).

> Corporate defendant Sanofi is a global pharmaceutical company organized as a societe anonyme under French law.  (CAC ¶ 24).  Its principal executives are based in Paris, France.  (CAC ¶ 24).  Individual defendant Christopher Viehbacher was Sanofi's CEO and a

member of the Board of Directors from December 2008 until his termination on October 29, 2014.  (CAC ¶ 25).

II.     Sanofi's Alleged Illegal Marketing Scheme.

Plaintiffs' allege that Sanofi was engaging in an illegal marketing scheme to drive up the sales of its diabetes product line in the US from at least as early as 2012.  (CAC ¶¶ 8-9).  The alleged scheme involved Sanofi funneling "tens, if not hundreds, of millions of dollars in disguised payments to consultants Accenture and Deloitte, which . . . served as middlemen in a scheme to induce pharmaceutical retailers and hospitals to favor Sanofi's diabetes drugs over competing drugs from Novo Nordisk."  (CAC ¶ 2).  Plaintiffs derive their allegations from the accounts of two corporate whistleblowers—Diane Ponte and Jean Kazimir—who were employed by Sanofi during the Class Period.  (CAC ¶ 9).  Information regarding Ponte's account of events comes from a whistleblower complaint she filed against Sanofi in New Jersey state court.  (CAC ¶ 40).  Neither the CAC nor the briefing on the instant motion reports the present status of Ms. Ponte's lawsuit.

Beginning in 2008, Ponte was a paralegal in the legal department's contracts group at Sanofi's US headquarters in New Jersey.  (CAC ¶ 39).  At some unspecified time during her employment, she claims to have learned that other employees in her department had been processing "improper" inducement payments to third parties on behalf of Sanofi, beginning around 2012.  (CAC ¶¶ 9, 41).  Those payments included, for example, $2.462 million to Walgreens, $1.956 million to Accenture, and $977,000 to Deloitte.  (CAC ¶ 41).  According to Ponte, Raymond Godleski, Assistant Vice-President of Special Projects, and Dennis Urbaniak, Vice-President in charge of the US Diabetes Unit, ordered those "improper" payments.  (CAC ¶ 41).

- 3 -

Service contracts, like Sanofi's contracts with Accenture and Deloitte, were normally "reviewed and approved" using a project management system called NEXTS. (CAC ¶ 42). Approval of such contracts involved review by Sanofi's legal department for compliance with appropriate regulations based on the subject matter of the contract, commonly called the "spend category." (CAC ¶ 42). Ponte claims that the "spend categories" of contracts involving the diabetes product line had been intentionally miscoded to conceal unlawful referral services. (CAC ¶ 42). For example, Ponte alleges that an August 2012 contract with Accenture, which called for $1,955,632 worth of "printed materials," was fraudulently coded to hide the fact that the money was actually an illegal kickback to Accenture for their referral or sale of Sanofi's diabetes products. (CAC ¶ 42).

In March 2013, Godleski submitted nine contracts to Ponte totaling $34 million in payments to Accenture and Deloitte. (CAC ¶ 43). Godleski directed Ponte to enter those contracts into Sanofi's project management system (NEXTS) for approval. (CAC ¶¶ 43-44). After reviewing the nine contracts, Ponte concluded that they too involved illicit payments to drug customers because they "failed to set forth an accounting of services or any other documentation . . . which explained why the contracts provided for payment." (CAC ¶ 43). Because Ponte believed these contracts were part of Sanofi's illegal marketing and kickback scheme, she brought her concerns to Jean Kazimir, who was Procurement Contracts Coordinator at Sanofi's US headquarters from January 2012 to July 2013. (CAC ¶ 44). At that time, Kazimir told Ponte that Godleski wanted the nine contracts approved without the usual legal screening. (CAC ¶¶ 44, 48).

On or about March 21, 2013, Godleski allegedly told Ponte that Viehbacher, the CEO of Sanofi, knew that she was holding back the nine contracts in question and was

"extremely unhappy" that she had not approved them yet.  (CAC ¶ 45).  At that point, Ponte notified superiors at Sanofi about the contracts and the related communications from Godleski.  (CAC ¶ 45).  In response, around March or April 2013, Sanofi allegedly commenced an internal investigation into the nine potentially fraudulent contracts, which continued at least through the third quarter of 2013.  (CAC ¶ 46).  During the summer, while the alleged internal investigation was ongoing, Godleski and Urbaniak both exited Sanofi.  (CAC ¶ 47).  Ponte claims that the internal investigation confirmed that the nine contracts violated Sanofi's internal policies and federal healthcare laws.  (CAC ¶ 46).

Around June 2013, Kazimir was interviewed as part of the alleged internal investigation.  (CAC ¶ 50).  Kazimir recalls Godleski asking her to process hundreds of millions of dollars in contracts to Accenture and Deloitte related to Sanofi's diabetes product line.  (CAC ¶ 48).  Godleski allegedly directed Kazimir to process the contracts as purchase orders for goods rather than as service contracts.  (CAC ¶ 48).  According to Kazimir, goods contracts did not require approval from Sanofi's legal department, unlike service contracts.  (CAC ¶ 48).  Sanofi's supply chain management software (Ariba) apparently rejected those contracts, causing them to be rerouted for approval through Sanofi's NEXTS system.  (CAC ¶ 48).  Kazimir believes those contracts were also part of Sanofi's scheme to funnel money through consultancies as kickbacks to induce customers to favor Sanofi's diabetes drugs.  (CAC ¶ 48).

III.    Defendants' Knowledge of the Alleged Illegal Marketing Scheme.

Plaintiffs allege that defendants knew about the illegal marketing scheme during the Class Period.  (CAC ¶ 51).  Plaintiffs claim that Viehbacher was aware of the kickback scheme on or about March 21, 2013, because Godleski told Ponte that Viehbacher knew she had the nine contracts and was "extremely unhappy" that she had not approved them yet.  (CAC ¶

45).  Plaintiffs also claim that Sanofi and Viehbacher knew about the illegal marketing scheme because of the alleged internal investigation into the nine suspicious contracts held back by Ponte.  (CAC ¶ 53).  According to plaintiffs, three separate corporate mechanisms in place at Sanofi would have made the Board of Directors and Viehbacher aware of the alleged internal investigation.  (CAC ¶ 53).  First, Sanofi's North American Corporate Compliance Officer briefs the Board of Directors quarterly.  (CAC ¶ 53).  Plaintiffs allege that the internal investigation sparked by Ponte's disclosures must have been mentioned during one of those briefings.  (CAC ¶ 53).  Second, Viehbacher was part of Sanofi's North American Compliance Committee, which, according to plaintiffs, was charged with overseeing whistleblower investigations such as the one at issue here.  (CAC ¶ 53).  And, third, Sanofi's US Code of Conduct requires that Sanofi inform persons accused of wrongdoing that a complaint had been made against them.  (CAC ¶ 53).  Because Ponte's complaint included allegations of wrongdoing by Viehbacher, plaintiffs allege that Sanofi would have informed Viehbacher of the internal investigation.  (CAC ¶ 53).

IV.     Alleged Misstatements and Omissions by Sanofi and Viehbacher during the Class Period.

        Plaintiffs allege that Sanofi and Viehbacher misled investors and inflated Sanofi's ADS price by hyping the sales growth of its diabetes products but failing to disclose the alleged illegal marketing scheme used to achieve those sales.  (CAC ¶ 2).  They also allege that defendants misled investors regarding Sanofi's commitment to corporate integrity, ethical behavior, and compliance with appropriate regulations.  (CAC ¶ 2).  Plaintiffs allege that defendants made at least fifteen material misstatements and omissions during the Class Period.

        Between February 7, 2013 and July 31, 2014, Sanofi filed seven Form 6-Ks with the SEC and issued seven accompanying press releases reporting that sales of its diabetes product line, including the "flagship" drug Lantus, grew by double-digits for each respective

quarter.[1]  (CAC ¶¶ 54, 61, 63, 67, 69, 75, 76).  On four of those seven filing dates, Sanofi also

held conference calls with investors during which representatives of Sanofi, including

Viehbacher himself on two occasions, highlighted the extraordinary sales performance of the

diabetes group.[2]  (CAC ¶¶ 55, 61, 63, 67).

Furthermore, on March 7, 2013 and March 7, 2014 respectively, Sanofi filed its

2012 and 2013 Form 20-F, its annual report with the SEC.  (CAC ¶¶ 57, 73).  The 2012 Form

repeated the allegedly misleading financial figures reported in the February 7, 2013 6-K and the

2013 Form repeated the allegedly misleading financial figures reported in all the 2013 6-Ks.

(CAC ¶¶ 57, 73).  Both stated that the diabetes group was a "growth platform" for the company.

(CAC ¶¶ 57, 73).  The two Form 20-Fs also noted that Sanofi applied a Financial Code of Ethics

to its top executives, including Viehbacher.  (CAC ¶¶ 57, 73).  That Code of Ethics, which the

20-Fs only incorporated by reference, required that, among other things, the officers would

"cause the Company to comply with applicable rules and regulations of all French and US

---

[1]The specific dates of the seven Form 6-Ks and press releases, and the coinciding diabetes product sales growth figures, are: February 7, 2013 at 29%, (CAC ¶ 54), May 2, 2013 at 19.6%, (CAC ¶ 61), August 1, 2013 at 17.7%, (CAC ¶ 63), October 30, 2013 at 20.1%, (CAC ¶ 67), February 6, 2014 at 19%, (CAC ¶ 69), April 29, 2014 at 13.2%, (CAC ¶ 75), and July 31, 2014 at 20.3%, (CAC ¶ 76).

The May 2, 2013 press release stated "[d]iabetes recorded another strong quarter with sales growth of 19.6%."  And, described the diabetes group as a "growth platform."  (CAC ¶ 61).  The August 1, 2013, October 30, 2013, and February 6, 2014 press releases also described Sanofi's diabetes group as a "growth platform."  (CAC ¶¶ 63, 67, 69).  The April 29, 2014 press release stated that Sanofi's growth in the first quarter was "driven by the performance of Diabetes."  (CAC ¶ 75).

[2] The specific dates of the four conference calls are: February 7, 2013, (CAC ¶ 55), May 2, 2013, (CAC ¶ 61), August 1, 2013, (CAC ¶ 63), and October 30, 2013, (CAC ¶ 67).  Viehbacher made positive statements about the growth of the diabetes platform during the conferences calls on February 7, 2013, (CAC ¶ 55), and October 30, 2013, (CAC ¶ 67).  In the February 7, 2013 conference call, Viehbacher stated that "Diabetes continues to perform extraordinarily well" and, another Sanofi spokesperson, Hanspeter Spek, said the diabetes group "has seen a record year. . . Lantus is a flagship product."  (CAC ¶ 55).  In the May 2, 2013 conference call, spokesman for Sanofi Spek characterized the diabetes group as "very strong, a very, very, continued growth."  (CAC ¶ 61).  In the August 1, 2013 call, Sanofi spokesperson Pascale Witz said that Lantus growth in the US was "above 20%".  (CAC ¶ 63).  And, in the October 30, 2013 conference call, Viehbacher said "Diabetes continues to go along extremely strongly.  You've seen the 20% growth in the third quarter.  That's the eleventh consecutive quarter of double-digit growth."  (CAC ¶ 67).

government entities . . . ."  (CAC ¶¶ 57, 73).  Viehbacher certified the accuracy of the disclosures

in Sanofi's two 20-Fs, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), stating, among

other things, that: "[b]ased on my knowledge, this report does not contain any untrue statement

of a material fact or omit to state a material fact necessary to make the statements made, in light

of the circumstances under which such statements were made, not misleading . . . ."  (CAC ¶¶

59, 74).

Both Form 20-Fs also contained several warnings to investors.  For example, they

disclosed that Sanofi "face[d] increasing pricing and reimbursement pressure on our

pharmaceutical products that could negatively affect our revenues and/or margins."  (Declaration

of Stefania D. Venezia ("Venezia Decl."), Ex. 7, p. 11; Ex. 1, p. 10).  That "the commercial

success of our existing products and our product candidates depends in part on the conditions

under which our products are reimbursed."  (Venezia Decl., Ex. 7, p. 11; Ex. 1, p. 10).  And, the

"increased difficulty in obtaining and maintaining satisfactory drug reimbursement rates" created

pricing and reimbursement pressure on the company.  (Venezia Decl., Ex. 7, p. 11; Ex. 1, p. 10).[3]

Plaintiffs allege that each of these filings and statements was materially false and

misleading.  All of Sanofi's 6Ks, with the accompanying press releases and conference calls, as

well as both of its 20-Fs failed to indicate that: (1) sales growth for its diabetes product line was

boosted by an illegal marketing and kickback scheme; (2) Sanofi's selling and general expenses

disclosures included unlawful payments that were part of the illegal marketing and kickback

---

[3] Although these excerpts from Sanofi's Form 20-Fs are not included in the text of the CAC, the Court may still rely
on them in disposing of the Rule 12(b)(6) motion because the text of Sanofi's 20-Fs is incorporated in, and is
integral to, the CAC.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153-54 (2d Cir. 2002) (holding that district
court could properly consider the text of contracts on motion to dismiss because Amended Complaint was "replete
with references to the contracts" and the content of the contracts was integral to the Amended Complaint); see also
San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 809 (2d Cir.
1996)

scheme; (3) Viehbacher had violated Sanofi's Financial Code of Ethics during each specific

quarter mentioned because he tolerated Sanofi's failure to comply with US anti-kickback laws;

and, (4) that Sanofi had received reports from two whistleblowers describing the illegal

marketing and kickback scheme and had launched an internal investigation in response.[4]  (CAC

¶¶ 56, 58, 62, 64, 68, 70, 73, 75, 76).  Both of Viehbacher's certifications of internal controls

omitted material facts and did not fairly present the financial condition and operation of Sanofi

because Sanofi did not indicate that sales growth for its diabetes product line was boosted by an

illegal marketing and kickback scheme.  (CAC ¶¶ 60, 74).

   In addition, on the allegedly misleading August 1, 2013 conference call, an

analyst asked Viehbacher about allegations that Chinese officials had questioned Sanofi and

other pharmaceutical companies about potential malfeasance in China.  (CAC ¶ 65).  Viehbacher

acknowledged that Chinese officials had visited Sanofi's China offices, but stated that

"[o]bviously, all of us have very tight compliance programs that we run here."  (CAC ¶ 65).  On

August 8, 2013, in response to another report that Sanofi bribed Chinese doctors to boost sales in

2007, an unidentified company spokesman stated that Sanofi had "zero tolerance for any

unethical conduct."  (CAC ¶ 66).  Plaintiffs allege that these two statement regarding Chinese

investigations into Sanofi were materially false and misleading because (1) Sanofi did not in fact

have a "tight compliance program" at the time of the statement and Viehbacher omitted mention

of the two whistleblower reports and Sanofi's internal investigation and (2) Sanofi, and

Viehbacher, were in fact tolerating unethical conduct within the diabetes group.  (CAC ¶¶ 65-

66).

---

[4] Because the reports from two whistleblowers describing the illegal marketing and kickback scheme had not been made and the internal investigation had not yet been launched, plaintiffs do not allege that the February 7, 2013 6K, press release, and conference call and the March 7, 2013 20-F were materially misleading on those grounds.

Finally, around March 6, 2014, Sanofi published its 2013 Corporate Social Responsibility Report (its "CSR Report"), which made a number of statements about the company's legal and ethical compliance standards and mechanisms.  (CAC ¶ 71).  Those statements included: "[w]e maintain an effective compliance organization" and "[o]ur strategy focuses on establishing and enforcing clear rules that are consistent with the legislative framework and are aligned with the industry's best practices, while seeking to go beyond regulatory compliance through our efforts toward transparency, accountability, and disclosure." (CAC ¶ 71).  Plaintiffs allege that the 2013 CSR was materially false and misleading because (1) Sanofi did not actually "maintain an effective compliance organization" or establish "robust internal systems" to prevent violations and (2) Sanofi was not actually committed to corporate transparency or accountability.  (CAC ¶ 72).

V.      Sanofi's Stock Price Slides.

Plaintiff allege that at the end of the Class Period, around the end of October 2014, Sanofi abandoned its illegal marketing and kickback scheme in response to the whistleblower reports and alleged internal investigation.  (CAC ¶ 80).  According to plaintiffs, that policy shift caused sales of Sanofi diabetes products to slow considerably.  (CAC ¶ 80).  It also led the Board to terminate Viehbacher as CEO because they, in plaintiffs' words, "tired of the corrupt practices fostered during Defendant Viehbacher's leadership."  (CAC ¶ 81). Consequently, Sanofi's share price fell significantly.

On October 6, 2014, Sanofi issued a press release announcing its investigation into allegations of improper payments to healthcare professionals in the Middle East and Africa. (CAC ¶ 77).  Then, on October 27, 2014, news emerged in a French newspaper *Les Echos*, and other sources, that Sanofi's Board of Directors was considering replacing Viehbacher as CEO.

(CAC ¶ 78).  Sanofi's stock price fell from $54.02 to $52.82—a drop of 2.22%—on that news. (CAC ¶ 78).

On October 28, 2014, Sanofi issued a press release and filed a Form 6-K that reported a decline in diabetes sales.  (CAC ¶ 79).  Viehbacher stated in that press release: "We have recently seen a more challenging U.S. diabetes price environment which will impact our diabetes sales throughout 2015."  (CAC ¶ 79).  In a subsequent conference call, Viehbacher stated less favorable contracts entered into "toward the end of the [prior] year" caused its diabetes products to face adverse pricing conditions.  (CAC ¶ 79).  On this news, Sanofi's shares fell around 9% on heavy trading from $52.82 to $48.07.  (CAC ¶ 80).

On October 29, 2014, Sanofi's Board terminated Viehbacher stating that: "[g]oing forward, the Group needs to pursue its development with a management aligning the teams, harnessing talents and focusing on execution with a close and confident cooperation with the Board."  (CAC ¶ 81).  The Board also claimed that Viehbacher refused to identify a successor and became otherwise uncooperative.  (CAC ¶¶ 86-87).  Sanofi's stock price subsequently fell nearly 6%, or $2.85, on heavy volume, closing at $45.22 on October 29, 2014.  (CAC ¶ 82).

Plaintiffs allege that the Board's performance-based explanation for the termination of Viehbacher was pretextual.  (CAC ¶ 85).  First, in contrast to the Board's statements about issues concerning corporate succession, Sanofi stated in the 20-F it filed on March 7, 2014 that Viehbacher fully satisfied all corporate governance goals, including "succession planning for all key posts."  (CAC ¶ 86).  Second, Viehbacher's compensation declined in 2013, which, plaintiffs allege, could only have come as a consequence of Sanofi's internal investigation.  (CAC ¶ 87).  In 2009 and 2010, for example, Viehbacher was awarded variable performance compensation of 200% of his fixed compensation; in 2012, he was

awarded 180%.  (CAC ¶ 87).  Meanwhile, in 2013, after the internal investigation was allegedly

completed, Viehbacher was awarded only 135% of his fixed compensation.  (CAC ¶ 88).

Plaintiffs claim that the termination of Viehbacher, and the slowing in sales of diabetes products,

all resulted from Sanofi identifying and stopping its illegal marketing and kickback scheme.

VI.    Procedural History.

On December 4, 2014, Joel Mofsenson filed an action, on behalf of a putative

class, against Sanofi, Viehbacher and Jerome Contamine alleging securities fraud.  (Dkt. 19).  On

February 2, 2015, Meitav filed a motion for appointment as lead plaintiff in the Mofsenson

Action.  (Dkt. 19).  Also on February 2, Ellen de Brabander filed a second action against Sanofi,

Viehbacher, Contamine, and others, 15 Civ. 753 (PKC).  (Dkt. 19).  On March 20, 2015, the

Mofsenson and Brabander actions were consolidated, Meitav was appointed lead plaintiff, and

Pomerantz LLP was appointed lead counsel.  (Dkt. 19).  Thereafter, plaintiffs filed the

Consolidated Amended Complaint, in which only Sanofi and Viehbacher were named as

defendants.  (Dkt. 22).  The Court gave plaintiffs an opportunity to amend their complaint to

respond to the deficiencies described by defendants in their pre-motion to dismiss letter.  (Dkt.

25).  In a letter to the Court, plaintiffs stated that they stand on the CAC as drafted.  (Dkt. 26).

Defendants, thereafter, filed their motion to dismiss the CAC.  (Dkt. 29).

DISCUSSION

I.    Legal Standards on Motion to Dismiss.

Pursuant to Rule 12(b)(6), Fed. R. Civ. P., to survive a motion to dismiss, "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 570 (2007)).  The Court must examine only the well-pleaded factual allegations,

ignoring any legal conclusions, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.  When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

A complaint alleging securities fraud is "subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." Id. at 99.  Namely, a plaintiff must satisfy the pleading requirements of Rule 9(b), Fed. R. Civ. P., and the PSLRA.  Id.  Rule 9(b) "requires that 'the circumstances constituting fraud . . . shall be stated with particularity.'" Id. (quoting Rule 9(b), Fed. R. Civ. P.).  A complaint based on misstatements "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)).  Plaintiffs "must demonstrate with specificity why and how" statements were false and misleading.  Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).

The PSLRA "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u–4(b)(l),(2)).  Its "state of mind" requirement necessitates "particular allegations giving rise to a strong inference of scienter." ECA, Local 134 IBEW Joint

- 13 -

Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Id. at 198 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007)) (internal quotation marks omitted).

II.     Claims Pursuant to Section 10(b) and Rule 10b-5.

In order to state a claim under section 10(b) of the Exchange Act and Rule 10b–5 plaintiffs must plead that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."  In re Int'l Bus. Machines Corp. Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998).  In this case, defendants challenge whether plaintiffs adequately plead any actionable false statements or omissions of material fact, a strong inference of scienter, and "loss causation"—i.e. that defendants' misstatements and omissions proximately caused plaintiffs' alleged losses.

A.  Pleading the Illegal Marketing and Kickback Scheme with Particularity.

As an initial matter, the Court addresses whether plaintiffs have adequately plead the underlying conduct on which they base their securities fraud claims.  The Court concludes that they have not.

Although the Court must assume all well-pleaded factual allegations in the CAC are true, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  In addition, a "complaint alleging securities fraud must satisfy Rule 9(b) . . . which requires that 'the circumstances constituting fraud . . . shall be stated with particularity'."  ATSI, 493 F.3d at

99 (quoting Rule 9(b), Fed. R. Civ. P.).  This rule "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."  Id. (citing Rombach, 355 F.3d at 171).  Plaintiffs allege that Sanofi was engaging in an illegal marketing scheme to drive up the sales of its diabetes product line in the US.  (CAC ¶¶ 8-9).  The alleged scheme involved Sanofi funneling "tens, if not hundreds, of millions of dollars in disguised payments to consultants Accenture and Deloitte, which . . . served as middlemen in a scheme to induce pharmaceutical retailers and hospitals to favor Sanofi's diabetes drugs over competing drugs from Novo Nordisk."  (CAC ¶ 2).  The existence of this scheme is the foundation for plaintiffs' securities fraud claims.  While plaintiffs have plausibly alleged the existence of certain contracts, they have failed to allege beyond a "speculative level" that those contracts amounted to illegal, fraudulent, or otherwise improper conduct.  The following are examples of specific pleading problems in the CAC.

First, plaintiffs plead that Ponte learned that other employees in her department processed "improper inducement payments."  (CAC ¶ 41).  They do not, however, allege any specific circumstances—from who, when, and in what context—she learned that employees had been making improper inducements payments.

Second, plaintiffs plead that those alleged inducements payments involved "intentionally miscoded" "spend categories," which served "to conceal the fact that the contracts were to procure unlawful referral services."  (CAC ¶ 42).  But, again, plaintiffs fail to allege any particular basis for concluding that the "spend categories" were miscoded, in what ways they were miscoded, or how, even assuming the "spend categories" were miscoded, the miscoding served to conceal an illegal kickback payment.  Nor do the plaintiffs allege any basis for concluding that the miscoding was "intentional."  Plaintiffs only quote Ponte's New Jersey

lawsuit where she says that the allegedly miscoded "funds were actually, upon information and reasonable belief, illegal kickbacks from Defendant Sanofi to Accenture for their referral and/or sale of Defendant Sanofi's diabetes drug." (CAC ¶ 42). This "upon information and . . . belief" allegation from a different lawsuit incorporated into the CAC does not suffice under the PSLRA. See Novak, 216 F.3d at 312 (quoting 15 U.S.C. § 78u-4(b)(1)) ("The PSLRA imposed an additional requirement: whenever plaintiffs allege, on information and belief, that defendants made material misstatements or omissions, the complaint must 'state with particularity all facts on which that belief is formed.'").

Third, plaintiffs allege that Ponte herself processed 9 illegal contracts worth $34 million. (CAC ¶ 43). But, plaintiffs do not identify the nine contracts in question, except to say that they were with Accenture and/or Deloitte, and do not plead any non-conclusory basis for the belief that those contracts were illegal kickbacks. They quote Ponte's own lawsuit where she said the contracts "failed to set forth an accounting of services or any other documentation from Accenture and/or Deloitte which explained why the contracts provided for payment of approximately $34,000,000.00 . . . or how said monetary figure represented the fair-market value of services being rendered by these non-party vendors to Defendant Sanofi," (CAC ¶ 43), but they do not allege facts specific to any one of the nine contracts that plausibly explains why the absence of that information makes the contract an illegal kickback.

Fourth, plaintiffs allege that Kazimir was asked to process "'hundreds of millions of dollars' worth of improper contracts to Accenture and Deloitte related to Sanofi's U.S. diabetes group." (CAC ¶ 48). Again, plaintiffs do not identify any specific contract in that group of "'hundreds of millions of dollars' worth of improper contracts." They allege that the unidentified contracts collectively were improper because they "were purchase orders for goods

rather than contracts for services." (CAC ¶ 48). But, plaintiffs do not identify with any particularity for what goods or services the contracts were, or should have been.

Fifth, plaintiffs allege that there was an internal investigation into Ponte's nine allegedly fraudulent contracts and that that investigation confirmed that they "violated Sanofi's internal policies and federal healthcare laws." (CAC ¶ 46). But, plaintiffs do not plead with particularity when the internal investigation began or when it ended; nor do they allege any facts evidencing any findings of the investigation. They plead only Ponte's conclusion that the investigation confirmed her suspicion without alleging how she arrived at that conclusion.

And, sixth, plaintiffs does not allege any facts showing that Accenture or Deloitte actually engaged in any unlawful referral services on behalf of Sanofi or that any drug retailers or hospitals actually received kickbacks or sold more Sanofi drugs because of any alleged kickbacks.

In sum, plaintiffs' do not plausibly allege with the requisite particularity that Sanofi paid kickbacks to third parties to increase sales. Nor do they plausibly allege that Sanofi conducted an internal investigation that found that any payments to third parties were improper. Plaintiffs rely on conclusions and labels to allege that groups of contracts were fraudulent and fail to show that the scheme actually materialized. Plaintiffs, therefore, do not plead sufficient factual matter to show that the basis for their securities fraud claim exists beyond a "speculative level." Twombly, 550 U.S. at 555.

B.  Misstatements or Omissions of Material Fact.

Defendants alleged misstatements and omissions can be divided into three categories: (1) statements about Sanofi's compliance and corporate integrity; (2) Viehbacher's Sarbanes-Oxley certifications; and, (3) SEC filings, press releases and conference calls stating

the growth in sales of Sanofi's diabetes products in the US.  Putting aside the inadequacy of the allegations of improper payments to third parties, the statements about compliance are not actionable as a matter of law.  Viehbacher's SOX certifications are not actionable omissions because plaintiffs fail to adequately plead scienter on the part of Viehbacher.  And, with regard to the third set of statements, the SEC filings, press releases and conference calls are not actionable because they only accurately report that Sanofi's diabetes products sales were growing.

    1.   Summary of Applicable Law.

        Rule 9(b) and the PLSRA both require a complaint alleging securities fraud based on misstatements to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI, 493 F.3d at 99 (citing Novak, 216 F.3d at 306); see also Dura Pharm., Inc., 544 U.S. at 345 (describing similar PLSRA requirements).  Some alleged misstatements, like "expressions of puffery and corporate optimism[,]" do not give rise to securities violations." Rombach, 355 F.3d at 174.  If a plaintiff challenges as fraudulent a statement of opinion, the plaintiff bears the burden of plausibly alleging that the speaker did not truly hold that opinion.  See City of Omaha, Neb. Civilian Emp. Ret. Sys. v. CBS Corp., 679 F.3d 64, 67–68 (2d Cir. 2012).[5]  In addition, other allegations of fraud may be "too speculative

---

[5] The Supreme Court in Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, 135 S. Ct. 1318, 1324 (2015) clarified liability for statements of opinion under section 11 of the Securities Act of 1933.  It maintained that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." Id. at 1327.  But, if a statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," than the omission creates liability. Id. at 1329.  Although addressing claims under section 11 of the Securities Act, Omnicare's analysis may also bear on claims dealing with opinions brought under section 10(b).  See City of Omaha, 679 F.3d at 67-68 (holding that the same reasoning regarding opinions that is used under sections 11 and 12 of the Securities Act of 1933 applies to claims under Sections 10(b) and 20(a) of the 1934 Act, "as these claims all share a material misstatement or omission element").

even on a motion to dismiss," particularly when premised on "distorted inferences and

speculations." ATSI, 493 F.3d at 104 (quotation and internal quotation marks omitted).

    2.  Application.

  a.  Statements of Compliance and Corporate Integrity.

      Plaintiffs allege that defendants made numerous materially misleading statements

regarding Sanofi's legal compliance and corporate integrity.  Plaintiffs point to statements made

in Sanofi's 2013 CSR, including: "[w]e maintain an effective compliance organization" and

"[o]ur strategy focuses on establishing and enforcing clear rules that are consistent with the

legislative framework and are aligned with the industry's best practices, while seeking to go

beyond regulatory compliance through our efforts toward transparency, accountability, and

disclosure."  (CAC ¶ 71).  They also identify Viehbacher's August 1, 2013 statement during a

conference call ("[o]bviously, all of us have very tight compliance programs that we run here")

and an unidentified Sanofi spokesman's August 8, 2013 statement that Sanofi had "zero

tolerance for any unethical conduct."  (CAC ¶¶ 65-66).  Plaintiffs further contend that Sanofi's

2012 and 2013 20-Fs are misleading because they incorporate by reference Sanofi's Financial

Code of Ethics.  (CAC ¶¶ 57, 73).  They allege that these statements were materially misleading

because Sanofi did not actually maintain an effective compliance program and did tolerate

unethical conduct in its diabetes group—i.e., Sanofi engaged in an illegal marketing scheme in

its US diabetes group—at the time the statements were made.

      These statements are not actionable under the securities laws.  Defendants'

statements about Sanofi's maintenance of an "effective compliance organization" or Sanofi's

"efforts toward transparency, accountability, and disclosure" are too general to cause a

reasonable investor to rely on them.  See ECA, 553 F.3d at 205-06.  Each of the statements is an

example of corporate "puffery," "which does not give rise to securities violations." Id. at 206.

In ECA Local, the Second Circuit held that JP Morgan Chase's ("JPMC") statements about risk management and corporate integrity—that JPMC had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process," and that JPMC "set the standard for integrity"—could not be the basis for a securities violation. Id. at 205-06. See also San Leandro, 75 F.3d at 811 (holding that "general announcements by Philip Morris that it was 'optimistic' about its earnings and 'expected' Marlboro to perform well" were mere "puffery" and "could not have misled a reasonable investor"); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (holding that NYSEG telling its investors that it would not "compromise its financial integrity" was not actionable under the securities laws). Defendants' statements about Sanofi's compliance program and corporate integrity are analogous to the statements held not to be actionable in ECA Local.

b. Viehbacher's Sarbanes-Oxley Certifications.

Plaintiffs also allege that Viehbacher's certification of the accuracy of disclosures in Sanofi's 2012 and 2013 Form 20-Fs, made pursuant to SOX, were materially false and misleading because the underlying 20-F did not indicate that sales growth for its diabetes product line was boosted by an illegal marketing and kickback scheme. (CAC ¶¶ 60, 74). These certifications are not actionable under the facts as pled in the CAC. As an initial matter, plaintiffs fail to allege "any facts pertaining to [Sanofi's] internal structure for financial reporting, much less that [Sanofi] lacked adequate internal controls." In re Gentiva Sec. Litig., 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013) (quoting City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., 10 cv 2835 (NRB), 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011); see also In re PetroChina Co. Ltd. Sec. Litig., 13 cv 6180 (ER), 2015 WL 4619797, at *11

(S.D.N.Y. Aug. 3, 2015) ("Even if PetroChina officials were engaging in bribery, the SAC does not make any allegations that would imply that the Company had flawed internal controls over financial reporting."); Janbay v. Canadian Solar, Inc., 10 cv 4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) ("Plaintiffs have failed to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why.").

Plaintiffs instead focus on Viehbacher's statement that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact. . . ." (CAC ¶ 59).  They allege that this was a misleading misstatement because the 20-F did not disclose that the allegedly improper payments to third parties were driving diabetes products sales growth.  (CAC ¶ 60).  Because this statement is qualified by the phrase "[b]ased on my knowledge," the falsity of the statement is entirely dependent on what Viehbacher knew, not on what was objectively true at the time of the statement.  See City of Monroe, 2011 WL 4357368, at *14 (quoting Podansky v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004)) (internal quotation marks omitted) ("In cases alleging a false statement of opinion, the falsity and scienter requirements are essentially identical" because "a material misstatement of opinion is by its nature a false statement, not about the objective world, but about the defendant's own belief").  Plaintiffs have failed to allege any facts showing that Viehbacher did not believe what he said.  See City of Omaha, 679 F.3d at 67–68 (holding that the burden is on the plaintiff to plausibly allege that the speaker did not truly hold that opinion). Moreover, as later explained, plaintiffs do not plead any facts giving rise to a strong inference that Viehbacher knew about the alleged illegal marketing and kickback scheme and therefore knew that the report misstated or omitted a material fact.  Based on the facts as plead in the

CAC, Viehbacher's certifications of internal procedures in both the 2012 or 2013 20-F are not actionable omissions.

    c.   SEC filings, press releases and conference calls reporting the growth in sales of Sanofi's diabetes products in the US.

Lastly, plaintiffs allege that defendants SEC filings, press releases and conference calls reporting the growth in diabetes product sales during the Class Period were misleading because they omitted material information.  Specifically, defendants filed seven Form 6Ks and two Form 20-Fs with the SEC between February 7, 2013 and July 31, 2014 reporting double-digit growth in sales of diabetes products and issued seven press releases and made statements during four conference calls touting those growth figures.  (CAC ¶¶ 54, 57, 61, 63, 67, 69, 73, 75, 76).  Plaintiffs argue that these statements were materially misleading because Sanofi failed to state that: (1) sales growth for its diabetes product line was boosted by an illegal marketing and kickback scheme; (2) Sanofi's selling and general expenses disclosures included unlawful payments that were part of the illegal marketing and kickback scheme; and, (3) that Sanofi had received reports from two whistleblowers describing the illegal marketing and kickback scheme and had launched an internal investigation in response.

 "[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  In re Time Warner, 9 F.3d at 267.  In some contexts, for example "where the disclosure duty arises from the combination of a prior statement and a subsequent event," whether the plaintiff has a duty to disclose is coextensive with whether the information omitted is "material."  Id.  Thus, if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as [] having significantly altered the 'total mix' of information available . . .  it is difficult to imagine a

circumstance where the prior statement would not be rendered misleading in the absence of the disclosure." Id. at 267-68 (internal citation and quotation marks omitted).

Courts in this district regularly hold that the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct. See In re Marsh & Mclennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006); In re Axis Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 586-87 (S.D.N.Y. 2006). Many of the same courts have held, however, that a duty to disclose uncharged criminal conduct does arise if it is necessary to ensure that a corporation's statements are not misleading. See In re Marsh, 501 F. Supp. 2d at 469; see also In re Axis, 456 F. Supp. 2d at 587; In re Sotheby's Holdings, Inc., 00 cv 1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000). The critical consideration for those courts in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether "the alleged omissions . . . are sufficiently connected to Defendants' existing disclosures to make those public statements misleading." In re Marsh, 501 F. Supp. 2d at 469; see also In re FBR Inc. Sec. Litig., 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008).

Plaintiffs argue that defendants had a duty to disclose the alleged illegal marketing and kickback scheme because Sanofi's reported diabetes sales were inflated as a result of the alleged scheme. Assuming *arguendo* that plaintiffs sufficiently plead the existence of the scheme, whether defendants had a duty to disclose the scheme depends on the substance of the statements: whether "alleged omissions . . . are sufficiently connected to Defendants' existing disclosures". In re Marsh, 501 F. Supp. 2d at 469.

The seven 6-Ks Sanofi filed during the Class Period are not actionable as a matter of law because they are simply accurate statements of past earnings and growth. As far as the

pleadings indicate, Sanofi's filings merely reported the financial health of the company and the percentage growth in diabetes product sales.  There is no allegation that Sanofi failed to accurately report any of its financial figures.  Courts in this district have held that "the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."  In re Marsh, 501 F. Supp. 2d at 470; see also In re FBR, 544 F. Supp. 2d at 356 ("Accurate statements of past earning figures are not themselves actionable under Section 10(b)."); City of Brockton Ret. Sys. v. Avon Products, Inc., 11 cv 4665 (PGG), 2014 WL 4832321, at *17 (S.D.N.Y. Sept. 29, 2014).  But see In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (holding that statements which "put the sources of [the defendant's] revenue at issue" gave rise to liability under section 10(b) because the company failed to disclose the improper conduct that generated that revenue).  Absent an allegation that Sanofi reported income that it did not actually receive or sales growth that did not actually occur, this Court agrees that "a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."  In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 & n. 3 (6th Cir. 1997).

Defendants' 20-Fs, press releases, and conference calls are also not actionable. Each of those statements were nothing more than accurate descriptions of the growth of diabetes products sales in a different form, and thus are treated just like Sanofi's 6-K filings.  The statements cited by the plaintiffs in Sanofi's 20-Fs, press releases, and conference calls did not, for example, plausibly attribute the growing sales of diabetes products to pharmacies implicated in the alleged illegal kickback scheme.  As a result, the omission of the alleged illegal marketing is not "sufficiently connected to Defendants' existing disclosures to make those public statements misleading."  In re Marsh, 501 F. Supp. 2d at 469.

Here, the statements made in defendants' 20-Fs and during defendants' conference calls and press releases did nothing more than characterize, albeit it with more fanfare, the statistical facts already disclosed in Sanofi's 6-Ks: that diabetes product sales were growing.  For example, in the February 7, 2013 conference call, Viehbacher stated that "Diabetes continues to perform extraordinarily well."  (CAC ¶ 55).  In the May 2, 2013 conference call, a spokesperson for Sanofi characterized the diabetes group as "very strong, a very, very, continued growth."  (CAC ¶ 61).  And, in the October 30, 2013 conference call, Viehbacher said "Diabetes continues to go along extremely strongly.  You've seen the 20% growth in the third quarter. That's the eleventh consecutive quarter of double-digit growth."  (CAC ¶ 67).  None of the statements cited by plaintiffs in the CAC offered any explanation as to why the products were selling more.  If accurately reporting the percentage growth of diabetes products is itself not actionable under the securities laws, which it is not, than it cannot be the case that merely reporting that growth in more colorful words, without attributing the sales growth to a particular factor that is implicated in the alleged fraud, is actionable.

In sum, none of defendants' SEC filings, press releases and conference calls reporting the growth in diabetes product sales during the Class Period are actionable omissions.

C.   Scienter.

Plaintiffs' securities fraud claims also fail because they do not adequately allege scienter.

1.   Summary of Applicable Law.

To satisfy the PSLRA's exacting pleading standards, plaintiffs must state "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Dura Pharm, 544 U.S. at 345 (quoting 15 U.S.C. § 78u–4(b)(l),(2)).  Section 10(b) and

Rule 10b-5 require that the defendant must have intended "to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 313 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n. 12 (1976)) (internal quotation marks omitted).  In addition to the *mens rea* of intent, "the Second Circuit has also concluded that *recklessness* is a sufficiently culpable mental state in the securities fraud context."  Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008) (emphasis added).  Securities fraud claims based on recklessness must "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  Novak, 216 F.3d at 308.

A plaintiff can establish scienter by alleging facts showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  ECA, 553 F.3d at 198.  To plead a strong inference of scienter through "motive and opportunity to commit fraud," a plaintiff must allege that a defendant "benefitted in some concrete and personal way from the purported fraud."  Id. (citing Novak, 216 F.3d at 307–08).  The "desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  Id.  Generally, to satisfy the "motive" prong, plaintiffs must show that "corporate insiders allegedly [made] a misrepresentation in order to sell their own shares at a profit."  Id.  If they are unable to make such a showing, "a plaintiff could raise a strong inference of scienter under the 'strong circumstantial evidence' prong."  Id. at 198-99.  However, if there is no evidence of motive, "the strength of the circumstantial allegations must be correspondingly greater."  Id. (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).  A plaintiff can plead

a strong inference of scienter where she sufficiently alleges that the defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Id. (quoting Novak, 216 F.3d at 311) (internal quotation marks omitted).

For an inference of scienter to qualify as a "strong inference," it must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314.  It need not, however, be irrefutable, i.e., a "smoking-gun," or even the "most plausible of competing inferences." Id. at 324 (quotation omitted).  In determining whether there is a strong inference of scienter, "courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." ECA, 553 F.3d at 198.  "When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters, 531 F.3d at 195.

2.  Application.

Plaintiffs expressly "do not pursue" the motive and opportunity prong as a means of establishing scienter.  (Plaintiffs' Memorandum of Law in Opposition, 22-23).  Instead, plaintiffs assert that the CAC establishes a strong inference of scienter on the part of Viehbacher and Sanofi because there is "strong circumstantial evidence of conscious misbehavior or recklessness." See ECA, 553 F.3d at 198.  As noted, where there is no allegation of motive, "the strength of the circumstantial allegations must be correspondingly greater." Id. at 199.  Plaintiffs focus on three allegations that they believe show that Viehbacher and/or Sanofi "knew facts or

had access to information suggesting that their public statements were not accurate," or "failed to check information they had a duty to monitor." Novak, 216 F.3d at 311.  None of the three allegations provide strong circumstantial evidence of conscious misbehavior and recklessness and so plaintiffs fail to create a cogent inference of scienter as to Viehbacher and Sanofi.

a.   Defendants' Access to the Whistleblower Report and Internal Investigation.

Plaintiffs allege that Viehbacher and Sanofi knew, or should have known, that their SEC filings and positive reports about growth in diabetes sales omitted material information because they were aware of Ponte's whistleblower report and the alleged follow-up internal investigation that confirmed the existence of an illegal marketing scheme.  Specifically, plaintiffs claim that three corporate policies ensured that Viehbacher knew about the alleged illegal marketing scheme: (1) Sanofi's North American Corporate Compliance Officer briefs the Board of Directors quarterly, which, according to plaintiffs, would have included information about Ponte's allegations; (2) Viehbacher was part of Sanofi's North American Compliance Committee, which, according to plaintiffs, was charged with overseeing whistleblower investigations; and, (3) Sanofi's US Code of Conduct requires that Sanofi inform persons accused of wrongdoing that a complaint had been made against them and, according to plaintiffs, Ponte's allegations named Viehbacher.  (CAC ¶ 53).  The knowledge of Viehbacher, the CEO of the company, would be imputed to Sanofi.

In essence, plaintiffs would draw the inference that Viehbacher had knowledge of an illegal marketing scheme because, by reason of his position and the operation of three corporate policies, he could obtain access to any allegations concerning, or investigation of, such a scheme, assuming it existed.  However, "[w]here plaintiffs contend defendants had access to contrary facts [i.e., facts contrary to public disclosures], they must specifically identify the

reports or statements containing this information." <u>Novak</u>, 216 F.3d at 309; <u>see also</u> <u>Teamsters</u> <u>Local 445</u>, 531 F.3d at 196 (holding that there was no inference of scienter based on defendants knowledge of facts, or failure to monitor information, because plaintiffs did not "specifically identified any reports or statements" that existed, or "would have come to light in a reasonable investigation, that would have demonstrated the falsity of the allegedly misleading statements"); <u>San Leandro</u>, 75 F.3d at 812 ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss.").  Here, plaintiffs allege that Viehbacher *must* have received information detailing the internal investigation and its findings because of the general operation of three corporate policies at Sanofi.  But, plaintiffs do not reference any specific report or statement that was produced as a result of any of those policies.  There are no statements from the Board or any corporate committee initiating an internal investigation nor any reports of the alleged internal investigation's findings.  The CAC does not explain when or why Ponte herself came to believe that the internal investigation "confirmed" that the third-party contracts were improper.

Furthermore, two of the three bases for this allegation of scienter amount to inferring Viehbacher's awareness of the contrary information solely because of his position within Sanofi.  Scienter, however, "cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information." <u>Foley v. Transocean</u> <u>Ltd.</u>, 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012); <u>see also</u> <u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007); <u>In re Winstar Commc'ns</u>, 01 cv 11522 (GBD), 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006); <u>In re Sotheby's</u>, 2000 WL 1234601, at *7; <u>cf.</u> <u>Novak</u>,

216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

On the facts as alleged in the CAC, plaintiffs inference of scienter based on the unreported findings of an unreported internal investigation is not as compelling as an alternative nonfraudulent inference: defendants did not have knowledge that their statements about Sanofi's diabetes sales were misleading because whatever internal investigation took place—if any—did not uncover any unlawful activity of a material proportion.  Moreover, plaintiffs' suggested inference of scienter is unreasonable.  If Sanofi's Board committed the resources necessary to undertake an internal investigation and that internal investigation uncovered unlawful behavior, why would the Board of a publicly-traded company not disclose that information?  To assume that Sanofi's Board was silently clutching the results of an investigation, presumably derived from interviews of persons both inside and outside the company, directly contradicts the rationale behind engaging in an internal investigation in the first place: the desire to uncover any improper conduct by Sanofi's employees.  No plausible rationale is offered that could explain why Sanofi would have devoted resources to an investigation that would become known to persons within and outside the Board but then never disclose its findings.  Because the allegations in the CAC do not support a strong inference of Viehbacher's scienter, they cannot support a strong inference of Sanofi's scienter on the grounds that Viehbacher's knowledge can be imputed to Sanofi.  Therefore, plaintiffs' suggested inference that Viehbacher and Sanofi knew their statements were misleading because an internal investigation was ordered but then never disclosed is not compelling.

b.  Viehbacher's Alleged Statement to Godleski about Ponte.

Plaintiffs allege that Viehbacher knew that his positive statements and reports about growth in diabetes sales omitted material information because "Ms. Ponte indicated that she was expressly told by Godleski that Defendant Viehbacher was aware of the nine contracts totaling $34 million that Ms. Ponte believed to constitute kickbacks—specifically, that Defendant Viehbacher was 'extremely unhappy' that the contracts had not been summarily approved."  (CAC ¶ 51).  Nothing in Godleski's alleged statement to Ponte, which references an alleged statement by Viehbacher to Godleski, raises a cogent inference that Viehbacher knew about the alleged illegal marketing scheme.  While it is plausible to assume that Godleski— Assistant Vice-President of Special Projects—had some access to Viehbacher and thus could have heard the alleged statement, plaintiffs do not plead factual content showing "in what form and context [Viehbacher] made his alleged statement [to Godleski]. . . ."  Janbay v. Canadian Solar, Inc., 10 cv 4430 (RWS), 2012 WL 1080306, at *11 (S.D.N.Y. Mar. 30, 2012); see also Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) (discounting confidential source allegations of scienter because no indication that the sources had any contact with any individual defendant); Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co., 724 F. Supp. 2d 447, 460-62 (S.D.N.Y. 2010) aff'd sub nom. Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co., 430 F. App'x 63 (2d Cir. 2011) (same).  The statement in itself, absent any supporting content showing Viehbacher had some indication that the contracts were improper, does not provide for a cogent inference that Viehbacher knew about the illegal marketing scheme and thus knew the statements he was making were misleading.  Instead, the opposing nonfraudulent inference arising from plaintiff's allegations is far more compelling: Viehbacher, as CEO, wanted Ponte to timely approve contracts worth $34 million because he

believed the contracts were for legitimate business transactions.  Again, because this allegation does not support a strong inference of Viehbacher's scienter, it cannot support a strong inference of Sanofi's scienter on the grounds that Viehbacher's knowledge can be imputed to Sanofi.

     c.   Actions of Godleski and Urbaniak.

     Plaintiffs allege Sanofi's corporate scienter based on the deliberately illegal behavior of employees Godleski and Urbaniak.  Unlike the previous two allegations, this allegation only relates to establishing corporate scienter, not Viehbacher's individual scienter. "When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters, 531 F.3d at 195.  "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant.  But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." Id.  Because plaintiffs otherwise failed to establish a strong inference of corporate scienter, the only remaining allegations that support an inference of corporate scienter is imputed knowledge based on the deliberately illegal behavior of Godleski and Urbaniak.

     Plaintiffs claim that Sanofi employees Godleski and Urbaniak were at the center of Sanofi's alleged illegal marketing scheme.  Godleski was Assistant Vice-President of Special Projects and Urbaniak was Vice President in charge of the US Diabetes Unit.  (CAC ¶ 41). According to plaintiffs, beginning around March 2012, Godleski and Urbaniak both directed Sanofi employees to approve contracts that plaintiffs believe were improper.  (CAC ¶ 41).  In particular, Godleski allegedly directed Ponte to approve nine contracts she believed were fraudulent, (CAC ¶ 43), as well as allegedly asked Kazimir to process hundreds of millions of

dollars in contracts to Accenture and Deloitte that she believed were fraudulent, (CAC ¶ 48).

Plaintiffs also allege that Godleski and Urbaniak left Sanofi during the time the alleged internal

investigation was ongoing.  (CAC ¶ 47).

        "While there is no simple formula for how senior an employee must be in order

to serve as a proxy for corporate scienter, courts have readily attributed the scienter of

management-level employees to corporate defendants."  In re Marsh, 501 F. Supp. 2d at 481; see

also In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (attributing

knowledge of a Vice Chairman, a Vice President and a Managing Director to the corporate

defendant); In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (attributing the

intentionally fraudulent behavior of senior management to the corporate defendant).  Thus, if

plaintiffs have sufficiently alleged Godleski's and Urbaniak's conscious misbehavior and

knowledge, there would be a strong basis to infer corporate scienter because both individuals

were management-level employees.  Plaintiffs have nonetheless failed to allege strong

circumstantial evidence that those employees' engaged in deliberately illegal behavior.

        Plaintiffs do not plausibly allege that either employee had a motive to orchestrate

a fraudulent scheme.  As a result, the circumstantial evidence that they were deliberately

engaging in a fraudulent scheme must be greater.  ECA, 553 F.3d at 199.  Critically, there are no

allegations showing how or why Godleski and Urbaniak would know that the contracts they were

asking employees to process were fraudulent.  Instead, the plaintiffs rely entirely on the

unsubstantiated conclusions of Ponte and Kazimir that the contracts with Accenture and/or

Deloitte that Godleski and Urbaniak asked them to process were in fact fraudulent.  While it is

plausible to infer that Godleski and Urbaniak did engage in illegal behavior based on the

conclusory allegations of the CAC, those allegations do not create a cogent inference that the two

- 33 -

employees were in fact engaging in deliberately illegal behavior.  As a result, there is no basis in the CAC to impute corporate scienter.

> D.  Loss Causation.

Even if plaintiffs plausibly alleged actionable omissions and scienter, which they did not, plaintiffs' securities fraud claims still fail because the CAC does not plausibly allege a causal link between Sanofi's alleged material omissions and the decline in Sanofi's stock price.

> 1.  Summary of Applicable Law.

"Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'"  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 197 (2d Cir. 2003)).  Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u–4(b)(4).  Plaintiffs can meet that burden by alleging either "(a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) 'that the [] loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'"  Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232-33 (2d Cir. 2014) (quoting In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 511, 513 (2d Cir.2010)).  Under the second theory, the "materialization of the risk" theory, a misstatement or omission is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations . . . ."  In re Omnicom Grp., 597 F.3d at 513 (quoting Lentell, 396 F.3d at 173).  "The zone of risk is determined by the purposes of the securities laws, *i.e.,* 'to make sure that buyers of securities get what they think they are getting.'"  In re Omnicom Grp., 597

F.3d at 513 (quoting Chem. Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 (2d Cir. 1984)).

If the relationship between the investor's loss and the information concealed by a defendant is

"sufficiently direct, loss causation is established . . . but if the connection is attenuated, or if the

plaintiff fails to 'demonstrate a causal connection between the content of the alleged

misstatements or omissions and 'the harm actually suffered' . . . a fraud claim will not lie."

Lentell, 396 F.3d at 174 (internal citations omitted).

      2.   Application.

      Plaintiffs are proceeding under the "materialization of the risk" theory of loss

causation.  (Plaintiffs' Memorandum of Law in Opposition, 27).  As a result, for plaintiffs to

succeed in properly pleading loss causation, they must plausibly allege two things: (1) that the

decline in Sanofi's stock price was caused by a materialization of the risk concealed by Sanofi's

alleged material omissions and (2) that the decline in stock price was a foreseeable consequence

of the alleged material omissions.  See Carpenters Pension Trust Fund, 750 F.3d at 232-33.

      Plaintiffs allege that Sanofi's shares declined in value between October 27, 2014

and October 29, 2014 because Sanofi's diabetes products faced less advantageous pricing in the

market, and thus sold less, and because Sanofi fired Viehbacher.  Plaintiffs further allege that

Sanofi sold fewer diabetes products and terminated Viehbacher all because Sanofi uncovered and

stopped implementing the alleged illegal kickback scheme, which was inflating the sales of its

diabetes products.

      One of the possible commercial risks concealed by Sanofi's failure to disclose

that it was engaging in an illegal kickback scheme is that Sanofi could not maintain the thriving

sales of its diabetes products without the illegal kickback scheme.  In other words, Sanofi, were

it operating within the bounds of the law, was a less successful company than it appeared to be

during the Class Period.  It is also plausible that a decrease in diabetes products sales, if

substantial enough, could have impacted Sanofi's share price because diabetes products generate

a substantial share of the revenue and income for Sanofi's Pharmaceutical's Group—Lantus, a

flagship diabetes drug, alone accounted for 17.3% of the Groups revenue for 2013.  (Venezia

Decl., Ex. 1).  Therefore, the decrease in diabetes sales and the subsequent decline in stock price,

which plaintiffs alleged coincided with Sanofi ending its kickback scheme, *could* be a

materialization of the risk concealed by Sanofi's omissions and *could* be a basis to claim loss

causation.

           However, plaintiffs do not plead facts showing that Sanofi's alleged improper

kickback scheme actually did materially inflate the sales of its diabetes products.  As a result,

there is no basis from which to plausibly infer that Sanofi ending its scheme would have any

material impact on Sanofi's stock price.  Plaintiffs do not allege facts showing that Accenture or

Deloitte actually engaged in any unlawful referral services on behalf of Sanofi or that any named

drug retailers or hospitals actually received kickbacks or sold more Sanofi drugs because of any

alleged kickbacks.  The CAC identifies "physicians, hospitals and/or retail pharmacy programs

such as Walgreens and Rite Aid," (CAC ¶ 43), without directly alleging that any specific one of

them received any improper payments or that the payments were responsible for increases in

sales of Sanofi's diabetes drugs by them.  Because plaintiffs have failed to plausibly and

adequately allege that the illegal kickback scheme had a significant impact on the market for

Sanofi's drugs in the first instance, there is no basis to judge the impact that Sanofi allegedly

ending the kickback scheme had on the market for its products, not to mention how that

translated into an effect on Sanofi's stock price.  In sum, the CAC failed to allege loss causation

because it does not plead a plausible causal relationship between the risk that fewer drug retailers

would prescribe Sanofi's products because they were no longer taking kickbacks from Sanofi and the actual drop in Sanofi's diabetes sales and stock price.

III.    Claims Pursuant to Section 20(a).

"To make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff 'must show a primary violation [here, the alleged Rule 10b–5 violations] by the controlled person [here, Sanofi] and control of the primary violator by the targeted defendant [here, Viehbacher], and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.'" Ganino v. Citizens Utilities Co., 228 F.3d 154, 170 (2d Cir. 2000) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)) (alterations added).  Because the CAC fails to state a primary violation, it cannot make out a claim under section 20(a).

CONCLUSION.

For the above mentioned reasons, defendants' motion to dismiss plaintiffs' CAC is GRANTED.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        January 6, 2016